ACCEPTED
03-12-00247-CV
4003695
THIRD COURT OF APPEALS
AUSTIN, TEXAS
2/3/2015 2:35:54 PM
JEFFREY D. KYLE
CLERK

No. 03-12-00247-CV

IN THE COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT OF TEXAS AT AUSTIN

FILED IN
3/8 COURT OF APPEALS
AUSTIN, TEXAS
2/3/2015 2:35:54 PM
JEFFREY D. KYLE
Clerk

**ROLAND OIL COMPANY**
*Appellant*,

v.

**RAILROAD COMMISSION OF TEXAS**,
*Appellee*.

Appeal from the 353rd Judicial District Court
Travis County, Texas
Cause No. D-1-GN-08-003472

**APPELLEE RAILROAD COMMISSION OF TEXAS'S REPLY TO APPELLANT ROLAND OIL COMPANY RESPONSE TO APPELLEE'S MOTIONS FOR REHEARING AND FOR *EN BANC* RECONSIDERATION**

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for
Civil Litigation

JON NIERMANN
Chief, Environmental
Protection Division

ANTHONY W. BENEDICT
Assistant Attorney General
State Bar No. 02129100
anthony.benedict@texasattorneygeneral.gov

February 3, 2015

PRISCILLA M. HUBENAK
State Bar No. 10144690

ELIZABETH R.B. STERLING
State Bar No. 19171100

LINDA B. SECORD
State Bar No. 17973400

STEVEN LORD
State Bar No. 24074618

OFFICE OF THE ATTORNEY
GENERAL
Environmental Protection Division
P. O. Box 12548 (MC-066)
Austin, Texas 78711-2548
Tel:  (512) 463-2012
Fax:  (512) 320-0911

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................. ii

INDEX OF AUTHORITIES ............................................................................ iii

    A unit operator's principal duty is to produce oil and gas and its failure to comply with regulations does not relieve it of this duty. (Reply to Roland's Response Point A) ..................................................................................... 2

    The Court's opinion runs counter to oil and gas law about the efforts a producer needs to make to maintain its right to produce minerals. (Reply to Roland's Response Point B) ............................................................................ 2

    The Court's opinion fails to apply the substantial-evidence test to the whole administrative record. (Reply to Roland's Response Point C) .................. 6

PRAYER ....................................................................................................... 9

CERTIFICATE OF COMPLIANCE ................................................................ 11

CERTIFICATE OF SERVICE ........................................................................ 12

# INDEX OF AUTHORITIES

**CASES**                                                                                                 **PAGE**

*Bargsley v. Pryor Petrol. Corp.,*
    196 S.W.3d 823 (Tex. App. – Eastland 2006, pet. denied)............................3

*Cox v. Stowers,*
    786 S.W.2d 102 (Tex. App. – Amarillo 1990, no writ) ..................................3

*Clifton v. Koontz*,
    325 S.W.2d 684 (Tex. 1959) ........................................................................7

*Hall v. McWilliams,*
    404 S.W.2d 606 (Tex. Civ. App. – Austin 1966, writ ref'd n.r.e.) .........3, 4, 5

*Hydrocarbon Mgmt., Inc. v. Tracker Expl., Inc.,*
    861 S.W.2d 427 (Tex. App. – Amarillo 1993, no writ) ................................3

*In re the Office of the Attorney General of Texas*,
    No. 14-0038, (January 30, 3015)
    *available at* www.txcourts.gov/media/825972/140038.pdf. ..........................8

*Phillips Petrol. Co. v. Rudd*,
    226 S.W.2d 464 (Tex. Civ. App. – Texarkana 1949, no writ) .......................3

*Ramsey v. Grizzle*,
    313 S.W.3d 498 (Tex. App. – Texarkana 2010, no pet.) ...............................3

*Ridge Oil Co. v. Guinn Invs., Inc.,*
    148 S.W.3d 143 (Tex. 2004) ........................................................................3

*Schroeder v. Snoga,*
    No. 04-96-00489-CV,
    1997 WL 428472 (Tex. App. – San Antonio, July 31, 1997, no writ)........3, 4

*Tex. Health Facilities Comm'n v. Charter Med.–Dallas, Inc.*,
    665 S.W.2d 446 (Tex. 1984) ........................................................................6

**Texas Administrative Code**

16 Tex. Admin. Code § 3.14 .......................................................................6

**Other**

Christopher L. Halgren, *Oil & Gas Lease Perpetuation: Operating, Reworking, Maintaining, and Production,* 39 State Bar of Tex. Oil, Gas & Energy Res. L. Sec. 60 (Fall 2014) .........................................................................3

No. 03-12-00247-CV

IN THE COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT OF TEXAS AT AUSTIN

**ROLAND OIL COMPANY**

Appellant,

**v.**

**RAILROAD COMMISSION OF TEXAS,**

Appellee.

Appeal from the 353rd Judicial District Court
Travis County, Texas
Cause No. D-1-GN-08-003472

**APPELLEE RAILROAD COMMISSION OF TEXAS'S REPLY TO APPELLANT ROLAND OIL COMPANY RESPONSE TO APPELLEE'S MOTIONS FOR REHEARING AND FOR *EN BANC* RECONSIDERATION**

TO THE HONORABLE COURT OF APPEALS:

The Railroad Commission of Texas ("Commission") replies to Appellant Roland Oil Company's ("Roland") Response to the Commission's Motions for Rehearing and for *En Banc* Reconsideration.

**A unit operator's principal duty is to produce oil and gas and its failure to comply with regulations does not relieve it of this duty.**
**(Reply to Roland's Response Point A)**

Roland incorrectly asserts that "the heart of producing oil and gas is compliance with the Commission's regulations."[1] But the purpose of oil and gas production is to actually produce oil and gas, not belatedly test inactive wells to continue plugging extensions. Compliance with the law is an obligation of an oil and gas producer, not its purpose for being.

While it is true that Roland could no longer produce its active wells after the Commission severed its unit, that does not transform Roland's tardy efforts to test inactive and nonproductive wells into an activity to restore the unit to production. As the Commission noted, those wells were inactive before severance and would remain inactive after Roland performed the test. Roland's response fails to address the Commission's argument that in order to maintain the unit after production ceases, Texas law requires operations that actually try to restore *production* in producing wells.

**The Court's opinion runs counter to oil and gas law about the efforts a producer needs to make to maintain its right to produce minerals.**
**(Reply to Roland's Response Point B)**

Contrary to Roland's response, the Court's opinion departs from oil and gas law precedent. An article published after the Commission's motion for rehearing by

---

[1] Roland's response at p. 2.

the Oil, Gas & Energy Resources Law Section of the State Bar of Texas in its Fall 2014 Section Report discusses Texas oil and gas law regarding the meaning of "operations" in oil and gas leases including the right to continue a lease after a cessation of production.[2] The article highlights that the Commission's position in this case is consistent with Texas oil and gas law, citing many of the same cases as the Commission in its briefing in this case.[3]

Another case discussed by the article, the San Antonio Court of Appeals case of *Schroeder v. Snoga*,[4] found that activities similar to those this Court relied on to show efforts to restore production actually were insufficient to keep the lease in force as a result of a cessation of production. In *Schroeder*, the operator had been severed just as Roland was severed in this case. But the *Schroeder* court held that activities in the nature of maintenance and to remove a regulatory barrier were not sufficient to hold the lease in force. The *Schroeder* court considered the operator's actions in "cleaning the tanks and motor, repairing the electrical system, and repairing a leak

---

[2] Christopher L. Halgren, *Oil & Gas Lease Perpetuation: Operating, Reworking, Maintaining, and Production*, 39 State Bar of Tex. Oil, Gas & Energy Res. L. Sec. 60 (Fall 2014). The article is attached as Exhibit A. The page numbers are added by the Commission for convenient reference. The article will be cited by reference to "Halgren at p. ___."

[3] *Hydrocarbon Mgmt., Inc. v. Tracker Expl. Inc.*, 861 S.W.2d 427 (Tex. App. – Amarillo 1993, no writ); *Ridge Oil Co., Inc. v. Guinn Invs., Inc.*, 148 S.W.3d 143 (Tex. 2004); *Bargsley v. Pryor Petrol. Corp.*, 196 S.W.3d 823 (Tex. App. – Eastland 2006, pet. denied); *Cox v. Stowers*, 786 S.W.2d 102 (Tex. App. – Amarillo 1990, no writ); *Hall v. McWilliams*, 404 S.W.2d 606 (Tex. Civ. App. – Austin 1966, writ ref'd n.r.e.); *Ramsey v. Grizzle*, 313 S.W.3d 498 (Tex. App. – Texarkana 2010, no pet.); *Phillips Petrol. Co. v. Rudd*, 226 S.W.2d 464 (Tex. Civ. App. – Texarkana 1949, no writ).

[4] No. 04-96-00489-CV, 1997 WL 428472 (Tex. App. – San Antonio July 31, 1997, no writ) (not designated for publication); *see* Halgren at p. 67.

in the flow line."[5]  After noting that "[r]e-working operations have been defined as any and all acts, work, or operations in which an ordinarily competent operator, under the same or similar circumstances, would engage in a good faith effort to cause a well to produce oil and gas in paying quantities . . . ,"[6] the Court rejected the operator's argument that it had engaged in reworking operations.  "Schroeder's acts were principally aimed at bringing the well into compliance with the RRC rules to avoid further penalty.  The actions were not an attempt to restore productivity to an unproductive well."[7]

Not only does Roland fail to address the array of oil and gas law cited by the Commission in its briefing in this case, Roland also unsuccessfully tries to distinguish *Hall v. McWilliams*[8] from the facts of the current case.  Roland suggests that its activities were more substantial than the minimal work discussed in *Hall.* But that argument does not respond to the Commission's position.  The work performed by Roland consisted of activities that either (1) constituted routine maintenance and repairs or (2) involved work to test inactive wells to obtain plugging extensions in order to obviate the Commission's severance order;[9] these activities were not operations to cause a well to produce oil and gas or to restore

---

[5] 1997 WL 428472, at *3.
[6] *Id*. (citation omitted).
[7] *Id*. (citation omitted).
[8] 404 S.W.2d 606 (Tex. Civ. App. – Austin 1966, writ ref'd n.r.e.).
[9] *See* Commission's brief at p. 23 – 32.

productivity to any well on the unit. That Roland may have performed more maintenance activities or more work to test inactive wells than in *Hall* begs the issue. The issue in this case is whether the *type of work* performed by Roland constitutes Unit Operations as defined in the Unit Agreement. It did not.

The Court's opinion at page 12 lists six bullet points of evidence from Roland's testimony at the contested case hearing. The work consisted of maintenance; flow-line and electrical repairs; Commission monthly reports and gauging; monitoring the lease including the possibility that a cow breaks a valve; inspecting roads, flow lines and fixing pumps; and keeping grass from growing around pump jacks because cattle can be injured. Roland also testified about efforts to repair inactive wells for testing to remove the Commission's severance order. Not a single one of these activities was taken to restore productivity to a well capable of producing oil and gas. These activities, no matter how frequent or voluminous, are simply inadequate to demonstrate that Roland never let ninety consecutive days pass when it was not working to produce minerals during the fifteen-month severance period in which no unit production occurred. Roland refers the Court to no evidence in the administrative record that it was conducting work to restore mineral production during that fifteen-month period.

**The Court's opinion fails to apply the substantial-evidence test
to the whole administrative record.
(Reply to Response Point C)**

Roland's argument that the Commission lacked substantial evidence for its findings of fact is not responsive to the Commission's arguments in its motion for hearing and for *en banc* review: Roland simply restates the Court's opinion. The Court failed to consider the whole administrative record when it decided the substantial-evidence issue, but the substantial-evidence standard demands consideration of the record as a whole.[10] The record in this case includes the Proposal for Decision prepared by the Commission's hearing examiner. The Commission adopted the findings of fact and conclusions of law recommended in the proposal.[11]

The proposal puts the findings of fact in context. The proposal states that "Roland has not met its burden,"[12] to show that it continues to have a possessory right to the minerals in the unit.[13] The proposal explains that Roland based its

---

[10] *Tex. Health Facilities Comm'n v. Charter Med.–Dallas, Inc.*, 665 S.W.2d 446 (Tex. 1984). (The APA "authorizes a reviewing court to test an agency's findings, inferences, conclusions, and decisions to determine whether they are reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole.").

[11] Commission's order at p. 1; AR, Part II, Jacket 1, at p. 39.

[12] PFD at p. 10; AR, Part II, Jacket 1, at p. 104.

[13] The proposal explains that the Commission does not adjudicate whether a lease or unit agreement is still in effect: "The Commission's authority in this area is limited to a determination of whether or not Roland has presented '[a] factually supported claim based on a recognized legal theory to a continuing possessory right in the mineral estate, such as evidence of a currently valid oil and gas lease or a recorded deed conveying a fee interest in the mineral estate.'" *Id*. citing 16 Tex. Admin. Code § 3.14.

argument that it had a good faith claim to operate the unit on two parts of Paragraph 18.1 of the Unit Agreement.[14] First, Roland argued that it had a possessory right because it kept producing minerals. But, because no wells were operating anywhere on the unit for fifteen consecutive months, that argument could not succeed.[15] Second, Roland argued that work to complete required testing on inactive wells kept the Unit Agreement in existence. This second argument is the proper context for considering whether substantial evidence supports the Commission's Finding of Fact 15:

> The relevant lease operations that Roland engaged in during the severance period between May, 2005 and August, 2006, were confined to those acts necessary to pass Commission required H-15 and H-5 testing. The wells were inactive before the testing and inactive after the testing. They did not contribute to the development of the unitized formation for the production of oil and/or gas.[16]

In that context, "relevant lease operations" refers to operations to pass the tests. The finding also notes that the wells were inactive both before and after the testing. That is important because, to be Unit Operations, operations must be "for the production of Unitized Substances." Because the wells being tested were inactive, and testing was only a required step in Roland's seeking an extension of time in which to plug

---

[14] PFD at p. 9; AR, Part II, Jacket 1, at p. 103.
[15] *Id.*, discussing *Clifton v. Koontz*, 325 S.W.2d 684 (Tex. 1959).
[16] PFD at p. 11, FF 15; AR, Part II, Jacket 1, at p. 105.

the wells, testing those wells could not be an operation "for the production" of oil and gas.

The Court's opinion takes Finding of Fact 15 out of the context of the whole administrative record in order to find it not supported by substantial evidence rather than recognizing that the Commission was only addressing Roland's argument that the lease operations necessary to pass the test were enough to maintain Roland's possessory right to minerals on the unit. But as the Texas Supreme Court recently explained, "[w]hen construing statutes, as anything else, one cannot divorce text from context."[17]

Finally, neither in merits briefing nor in its response to the Commission's motions has Roland provided *any* evidence that it was working to produce minerals during the fifteen-month period of the Commission's severance order. As explained above, an operator must be working to *produce* minerals, not just working to comply with agency rules in order to maintain its possessory rights in the minerals under the Unit Agreement or any similar lease agreement. The bullet points cited in the Court's opinion refer only to maintenance, not to activities to *produce* minerals.

---

[17] *In re the Office of the Attorney General of Texas*, No. 14-0038, slip op. at p. 4 (January 30, 3015) *available at* www.txcourts.gov/media/825972/140038.pdf.

**Prayer**

For the reasons stated in the Commission's motions for rehearing and *en banc* reconsideration and as further explained in this reply, the Commission asks the Court to grant its motion for rehearing and affirm the district court's judgment, and further, that a majority of the Court orders reconsideration of the Court's opinion and judgment and the case is resubmitted to the Court for *en banc* review and disposition.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

JON NIERMANN
Chief, Environmental Protection Division

*/s/ Anthony W. Benedict*
ANTHONY W. BENEDICT
Assistant Attorney General
State Bar No. 02129100
anthony.benedict@texasattorneygeneral.gov

ELIZABETH R.B. STERLING
Assistant Attorney General
State Bar No. 19171100
elizabeth.sterling@texasattorneygeneral.gov

PRISCILLA M. HUBENAK
Assistant Attorney General
State Bar No. 10144690
priscilla.hubenak@texasattorneygeneral.gov

LINDA B. SECORD
Assistant Attorney General
State Bar No. 17973400
linda.secord@texasattorneygeneral.gov

STEVEN H. LORD, JR.
Assistant Attorney General
State Bar No. 24074618
steven.lord@texasattorneygeneral.gov

Environmental Protection Division
Office of the Attorney General
P.O. Box 12548, MC 066
Austin, Texas 78711-2548
Tel.: (512) 475-4015
Fax: (512) 320-0911
ATTORNEYS FOR APPELLEE,
RAILROAD COMMISSION OF TEXAS

**Certificate of Compliance**

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I certify that this computer-generated document, excluding the contents listed in Texas Rule of Appellate Procedure 9.4(i)(1), contains approximately <u>2258</u> words. I relied on the word count of the computer program used to prepare the document.

*/s/ Anthony W. Benedict*
ANTHONY W. BENEDICT

# Certificate of Service

On February 3, 2015, a true and correct copy of the foregoing ***Railroad Commission of Texas's Reply to Appellant Roland Oil Company Response to Appellee's Motions for Rehearing and for En Banc Reconsideration*** was served on the following counsel electronically through an electronic filing service provider and by email:

Christopher Brunetti
The Bargas Law Firm
P. O. Box 302439
Austin, Texas 78703
Chris@Bargas-Law.com

Dario Bargas
The Bargas Law Firm
1000 Heritage Center Circle
Round Rock, Texas 78664
Dario@Bargas-Law.com

Christopher Brunetti
P. O. Box 2927
Harker Heights, Texas 76548
cbrunettilawfirm@gmail.com

*/s/ Anthony W. Benedict*
ANTHONY W. BENEDICT

# EXHIBIT A

VOLUME 39, NUMBER 1 / FALL 2014

**OFFICERS**

**David M. Patton, Chair**
3400 JPMorgan Chase Tower
600 Travis Street
Houston, Texas 77002
(713) 226-1254

**Ricardo E. Morales, Chair--Elect**
602 East Calton Road
P.O. Box 6668
Laredo, Texas 78042
(956) 727-4441

**Charles W. Gordon IV, Vice-Chair**
800 N. Shoreline Blvd., Suite 800
Corpus Christi, Texas 78401
(361) 880-5858

**Peter E. Hosey, Secretary**
112 E. Pecan Street, Suite 2400
San Antonio, TX 78205
(210) 228-2423

**Kathleen E. Magruder, Treasurer**
201 Helios Way
Houston, Texas 77079
(713) 323-0511

**M.C. Cottingham Miles, Immediate Past Chair**
300 Convent Street, Suite 2500
San Antonio, Texas 78205
(210) 220-1354

**COUNCIL:**

TERMS EXPIRE 2015
Prof. Owen Anderson
Lisa Vaughn Lumley
Michael D. Jones

TERMS EXPIRE 2016
Chris Aycock
John P. Bowman
Michael E. McElroy

TERMS EXPIRE 2017
Shonnie Daniel
Jeffery McCarn
Jeff Weems

**SECTION REPORT EDITOR:**
Michael D. Jones
6363 Woodway, Suite 1100
Houston, TX 77057
(713) 652-4068

SECTION REPORT OF THE



OIL, GAS & ENERGY RESOURCES LAW
SECTION OF THE STATE BAR OF TEXAS



## IN THIS ISSUE

Chair's Message                                                                                            3
By:   David Patton
       Houston, Texas

Tribute to Ed Hill                                                                                         4

Editor's Message                                                                                          6
By:   Michael D. Jones
       Houston, Texas

Partition of Minerals in Texas                                                                             7
By:   Ronald D. Nickum
       Amarillo, Texas

Midstream Development Trends                                                                               52
By:   Arthur Wright, Rebecca Seidl and David Cias
       Dallas, Texas and Houston, Texas

Oil & Gas Lease Perpetuation:  Operating, Reworking, Maintaining, and Production          60
By:   Christopher L. Halgren
       Houston, Texas

Disputes Between Operators and Non-Operators                                                               81
By:   Michael C. Sanders and Katherine Willyard
       Houston, Texas

LNG Exports:  Will the United States Become the World's Largest LNG Exporter?             108
By:   Susan L. Sakmar
       Houston, Texas

Royalty and Deductions-Old Issues in New Plays                                                            131
By:   Robert L. Theriot and Joshua P. Downer
       Houston, Texas

# OIL & GAS LEASE PERPETUATION: Operating, Reworking, Maintaining, and Production

Christopher L. Halgren
MCGINNIS LOCHRIDGE & KILGORE, LLP
711 Louisiana St., Suite 1600
Houston, Texas 77002
chalgren@mcginnislaw.com

## I. INTRODUCTION

The habendum clause in an oil and gas lease defines the initial term of a lease, known as the "primary term," which is usually expressed in a number of years. *See Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002). It will also describe certain conditions which the lessee must satisfy in order to perpetuate the lease beyond the primary term, into what is known as the "secondary term" and maintain the lease "so long thereafter" as the conditions are met. *See id.* Failure to meet these conditions could cause the lease to terminate at the end of the primary term. *See e.g. Sutton v. SM Energy Co.*, 421 S.W.3d 153, 158 (Tex. App.—San Antonio 2013, no pet.). Generally, an oil and gas lease "may be kept alive after the primary term only by production in paying quantities, or a savings clause, such as a shut-in gas well clause, drilling operations clause, or continuous operations clause." *See Hydrocarbon Mgmt, Inc. v. Tracker Expl. Inc.*, 861 S.W.2d 427, 432 (Tex. App.—Amarillo 1993, no writ).

This paper explores some of the key aspects of the types of "operations" and "reworking" activities that may (or may not) be sufficient to hold a lease into the secondary term, as well as a discussion of certain types of actions available at law or authorized by the lease that could potentially hold a lease in force and effect beyond the primary term, even absent actual operations on, or production from, the leased premises.

When attempting to perpetuate a lease into the secondary term, many complicated and overlapping issues and considerations are at play and deserve specific attention. A lessee may have several arguments available in defense of a lease termination suit, each which may be asserted together. *See Skelly Oil Company v. Harris*, 352 S.W.2d 950, 953 (Tex. 1962) (holding that, while lessee could have paid shut-in royalties, this was not the exclusive method of maintaining the lease and the lessee could elect, as it did, to maintain the lease by continuing diligent operations). Determining whether a certain action or actions successfully perpetuated a lease can require a fact intensive analysis and can depend, not only on any one specific action, but also on the lessee's diligence and motivation for its conduct.

An oil and gas lease grants the lessee a fee simple determinable interest in the property. *See Anadarko Petroleum Corp.*, 94 S.W.3d at 554 (Tex. 2002). A lessor who believes that his lessee failed to meet the conditions required to perpetuate the lease can seek a declaration from a court that the lease has terminated. Sometimes a lease can even terminate without any action taken by the lessor. Termination lawsuits can have harsh effects. Even the threat of a termination suit can cause great concern to a lessee.

## II. KNOW YOUR LEASE

Probably the most critical aspect of lease maintenance is for the lessee to know and understand its lease. A lessee should be aware that the language in the lease matters and will generally be enforced as written. "An oil and gas lease is a contract, and its terms are interpreted as such." *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 210-11 (Tex. 2011) (citing *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005)); *accord Valence Operating Co. v. Dorsett*, 164

S.W.3d 656, 662 (Tex. 2005) (interpreting an oil and gas lease using contract principles). In construing an unambiguous oil and gas lease, a court should "seek to enforce the intention of the parties as it is expressed in the lease." *Exxon Corp.*, 348 S.W.3d at 210-11 (citing *Tittizer*, 171 S.W.3d at 860).

A court will construe a lease "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and when possible will attempt to avoid "a construction that is unreasonable, inequitable, and oppressive." *See EOG Res., Inc. v. Killam Oil Co., Ltd.*, 239 S.W.3d 293, 298 (Tex. App.—San Antonio 2007, pet. denied) (citing *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex.1987)). However, an unambiguous instrument will be enforced as written, and ordinarily the writing alone will be deemed to express the parties' intentions. *See id.*

## A. Defined Terms

If the lease contains a definition of a word or phrase like "operations," "drilling operations," "reworking operations," "shut-in royalty," or "production in paying quantities," then the definition provided in the lease will generally control, even if the definition materially differs from the generally accepted industry meaning of that word or phrase. A lessee should not rely solely on a general understanding of industry concepts and terms, because those concepts and terms may be dramatically and materially altered by the language of a lease.

For instance, at the heart of the dispute in *PNP Petroleum I, LP v. Taylor* was whether the court should utilize the generally accepted meaning of "shut-in royalty" or whether the court should utilize the definition of "shut-in royalty" present in the lease. *See* 04-13-00445-CV, 2014 WL 2106572 (Tex. App.—San Antonio May 21, 2014, no. pet. h.). As

discussed in greater detail herein below in Section V.B., a "shut-in royalty" is generally understood to be a royalty payment tendered in lieu of actual production when there is a well *capable of* production in paying quantities on the leased premises. *See id.* (citing *Hydrocarbon Mgmt., Inc. v. Tracker Exp., Inc.*, 861 S.W.2d 427, 432–33 (Tex. App.—Amarillo 1993, no writ). Even if the lease does not expressly provide that a well be "capable of" producing in paying quantities, courts will typically read this requirement into the lease as a matter of law. *See id.* The lease at issue in *PNP Petroleum* provided for shut-in royalty payments only if there were wells *not* capable of producing oil or gas in paying quantities. *See id.* The court, noting that the negotiated lease language "deviate[d] from the general law that would engraft the *'capable of'* producing in paying quantities requirement into this lease," held that the language of the lease controlled, not any generally accepted meanings. Thus the lessee properly tendered shut-in royalty payments when there were old wells on the leased premises which were incapable of producing oil or gas in paying quantities and perpetuated the lease. *See id.*

## B. Conditions and Covenants

An oil and gas lease contains both conditions and covenants. "Breach of a condition results in automatic termination of the leasehold estate upon the happening of stipulated events. Breach of a covenant does not automatically terminate the estate, but instead subjects the breaching party to liability for monetary damages, or in extraordinary circumstances, the remedy of a conditional decree of cancellation." *Rogers v. Ricane Enterprises, Inc.*, 772 S.W.2d 76, 79 (Tex. 1989).

Customarily, covenants in an oil and gas lease are those contained in the habendum clause which require either production or a specified level of operations or other activity,

without which the lease will terminate. However, leases can be modified to create additional covenants, such as the proper payment of production royalties or the timely payment of shut-in royalties. *See e.g. Vinson Minerals, Ltd. v. XTO Energy, Inc.*, 335 S.W.3d 344, 354 (Tex. App.—Fort Worth 2010, pet. denied) (discussing promise to pay royalty is generally a covenant, but can be transformed into a condition subsequent by agreement).

However, Texas law disfavors forfeiture when a forfeiture is claimed for breach of a condition subsequent. *See id.* "[I]f the lease contract is susceptible of two reasonable interpretations, it should be construed as to prevent a forfeiture." *Id.* In *Vinson Minerals*, the court held that the royalty owners were not entitled to judgment that the lease terminated because they had failed to "literally comply" with the lease which required them to provide proper notice before the lease would terminate for nonpayment of royalty. *See id.* at 354.

## III. PERPETUATING A LEASE WITH ACTIVITY ON THE LEASE LANDS

"[O]il and gas leases generally...include a continuous drilling or continuous operations clause to prevent the lease from expiring at the end of the primary term while drilling operations are in progress. These clauses, in effect, make drilling operations the equivalent of production for purposes of the habendum clause." *Sutton v. SM Energy Co.*, 421 S.W.3d 153, 158 (Tex. App.—San Antonio 2013, no pet.). Habendum clauses vary from lease to lease and a lessee should be aware of the type and level of activity required to maintain the lease. The level of activity required could include general "operations," "drilling operations," "actual drilling operations," and/or "reworking operations." Unless these terms are specifically defined in the lease, a court should strive to apply the generally accepted industry meanings.

### A. "Operations"

Williams and Meyers defines the term "operations" as "[a]ny work or actual operations undertaken or commenced in good faith for the purpose of carrying out the rights, privileges or duties of the lessee under a lease, followed diligently and in due course by the construction of a derrick and other necessary structures for the drilling of an oil or gas well, and by the actual operation of drilling in the ground." *See* Patrick H. Martin & Bruce M. Kramer, WILLIAMS & MEYERS MANUAL OF OIL AND GAS TERMS (11th Ed.).

This definition of "operations" takes into account more than the physical activity of the operator on the leased premises, and should lead a court to consider the lessee's diligence and good faith. The lessee's goal should be to obtain production from the leased premises and a lessee should do so with diligence. Additionally, the lease may raise the level of activity required to perpetuate the lease from "operations" to a higher standard, such as either "drilling operations" or "actual drilling operations."

### 1. Must be physical operations aimed at obtaining production

Courts appear to focus on "manual operations," rather than other non-physical activity required to market oil and gas, such as negotiating required contracts. *See e.g. Gulf Oil Corp. v. Reid*, 337 S.W.2d 267, 268 (Tex. 1960).

In *Gulf Oil*, the lessee began drilling a well a few days before the end of the primary term and ultimately completed the well as a producer. *See id.* at 53. However, because of a lack of market facilities, the lessee shut-in the well and began negotiating for the sale of

its gas, which was secured. Gas began being produced ten months after the well was originally shut-in. The lessor claimed that the lease terminated for lack of production during the ten-month period the well was shut-in. "The trial court had held that the lessee had at all times exercised due diligence in its efforts to provide a market and that these efforts culminated successfully in obtaining the pipe line company to lay and connect its gathering lines to the well." *Id.* at 58. However, the Texas Supreme Court found that the lessee's negotiating efforts, even if diligent, were not "manual operations" and that "the term 'operations' cannot be extended to include a search on the part of lessee for a market or to secure a purchaser." *See id.* at 57. Because there was no production during the time the lessee was negotiating for the sale of its gas, the court found that the lease terminated. *See id.*

### 2. Must be diligently seeking production

When determining whether a lessee has performed sufficient "operations" to perpetuate a lease, some courts have found that "the question is one of reasonable diligence of operations." *See e.g. Pardue v. Mark*, 279 S.W.2d 594, 596 (Tex. App.—Fort Worth 1955, no writ). Essentially, courts will look less favorably on a lessee that scrambles to perform some sort of activity shortly before the end of the primary term, only to abandon the activity after the primary term expires, or at least unreasonably delays in attempting to establish production. In *Pardue*, the court found that the operator acted diligently in attempting to obtain production from the leased premises sufficient to maintain the lease. During the drilling of the well, pipe casing was lost in the hole, making it "impossible or impracticable of completion as an oil well through such hole." *See id.* at 595. Shortly after the loss of the casing pipe, the lessee "skidded his rig and moved the tools

and immediately began the drilling of the second" well. *See id.* Because of the diligence activity conducted by the operator, the *Pardue* court found that the operations were sufficient to perpetuate the lease. *See id.* at 596.

A different result was found in *Ridge Oil Co., Inc. v. Guinn Investments, Inc. See* 148 S.W.3d 143 (Tex. 2004). In *Ridge Oil*, the Texas Supreme Court found that the lessee's actions were not sufficient where evidence suggested the lessee drove a stake into the ground to mark a well site, obtained a drilling permit, and was attempting to pay surface damages, but then did not continue with any other actions. *See id.* at 158. Here, the court keyed, in part, on the lessee's lack of diligence in its operations, concluding that the activities performed by the lessee were not sufficient "operations" to perpetuate the lease. *See id.* at 159. In *Ridge Oil*, there were two lessees under a single lease, Ridge Oil and Guinn Investments. The lease covered two separate 160-acre tracts and each lessee was responsible for one of the two tracts. *See id.* at 147. In December 1997, there were two producing wells on the leased premises and both were located on the "Ridge tract." There was no well on the "Guinn tract." *See id.* In an alleged attempt to terminate Guinn's interest in the leased premises, Ridge decided to shut its wells in so that the leases would terminate at which time Ridge would obtain new leases from the then-current mineral owners. The electricity to the wells was cut off on December 1, 1997 and the wells ceased to produce on that date. *See id.* at 148. Guinn, hoping to avoid termination of its interest, obtained a drilling permit for a new well, but the permit was not obtained until seventy-seven days after the Ridge's wells were shut in.

At trial, Guinn also offered evidence that it had attempted to tender surface damage payments and began to stake a new well site.

*See id.* The court looked at whether there was production from the leased premises on the date Ridge acquired new leases, which was held to be the date Ridge's interest in the lease terminated. *See id.* at 152-153. At that point the court stated that only production obtained by Guinn could hold the lease, of which there was none. *See id.* at 153. Guinn argued that his "operations" were sufficient to hold the lease in the absence of any production. The court identified a 25-day span, which started on the date production permanently ceased and ended on the date the Guinn's lease was repudiated by the lessors. *See id.* at 158.

The court held that, even if Guinn had started staking the well during this time, such action was insufficient to raise a fact question as to whether "operations" were being carried on sufficient to maintain the lease. *See id.* The court found that Guinn was required to "conduct operations each and every day," which he failed to do. *See id.* at 160. The result in *Ridge Oil* may have been different if Guinn had initiated operations after production ceased on the Ridge tract, and then diligently continued its activity until the lease was repudiated or production was obtained, whichever occurred first.

### 3. Heightened level of activity

Some leases require more than just "operations" and instead require the lessee to perform "drilling operations," or more, to perpetuate the lease. There is a clear difference between "operations" and "drilling operations," the former being more broad than the latter. *See e.g. Ridge Oil Company*, 148 S.W.3d at 158-159 (discussing various cases analyzing the meaning of "operations" and "drilling operations").

When a lease requires "drilling operations," rather than "operations" courts have held that the activity conducted must be "preliminary to the actual work of drilling."

*See Bargsley v. Pryor Petroleum Corp.,* 196 S.W.3d 823, 826 (Tex. App.—Eastland 2006, pet. denied). In *Bargsley,* the court described certain actions that, although they may be considered "operations" could not, *as a matter of law,* be considered "drilling operations." *See id.* at 826. The activities included long-stroking an existing well; laying a pipeline to gas wells; "doing electrical work on the lease; allowing the electricity to remain on; installing, checking and repairing flow lines; replacing a tank; and allowing all of the equipment to remain on the wells." *See id.* The court held that these operations were not actual operations prepatory to drilling, and thus could not keep the lease alive where "drilling operations," rather than simply "operations" was required. *See id.*

In *Veritas Energy, LLC v. Brayton Operating Corp.,* the lease provided for "operations," but the lease defined that term as "drilling, testing, completing, reworking, recompleting, deepening, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil, gas, sulphur or other minerals . . . ." *See* 13-06-061-CV, 2008 WL 384169 (Tex. App.—Corpus Christi Feb. 14, 2008, pet. denied). In determining whether the lessee's activity was sufficient to maintain the lease past the end of the primary term, the court interpreted the term "operations," as defined in the lease, to require "drilling operations." *See id.* The court concluded that the lessee's activity, which was limited to "the mere back dragging of grass with a back hoe on the last day of the primary term, apparently to mark the location of a road," was not sufficient "drilling operations" to maintain the lease. *See id.*

Some leases require "actual drilling operations" to maintain the lease. While there is not much guidance on this standard, it appears to be higher than simply "drilling operations." While courts tend to construe "drilling operations" to include all operations

"prepatory to drilling," it is possible that a standard of "actual drilling operations would require the drill bit to actually penetrate the ground." Compare *Bargsley*, 196 S.W.3d at 826 (discussing "drilling operations") with Patrick H. Martin & Bruce M. Kramer, WILLIAMS & MEYERS MANUAL OF OIL AND GAS TERMS (11th Ed.) (definition of "actual drilling operations" stating that "this term has been construed by an Interior Department decision as requiring the actual penetration of the ground by the drill bit").

## B.    "Reworking Operations"

A lessee may also be able to perpetuate its lease by timely commencing "reworking operations." While "drilling operations" are those aimed at establishing initial production, reworking operations are generally understood to be actions aimed at restoring or increasing production from an existing well. As with general "operations," courts evaluating whether a lessee's activity was sufficient to constitute "reworking operations" will look beyond the activity on the ground and may take into consideration both the lessee's motivation for performing the activity and its diligence in completing it. The lessee's actions must also be commenced timely.

The pattern jury charge drafted by the Oil, Gas, & Energy Section of the State Bar of Texas defined "reworking operations" as "any and all actual acts, work, or operations in which an ordinarily competent operator, under the same or similar circumstances, would engage in a good faith effort to cause a well or wells to produce oil or gas in paying quantities." *See* Oil and Gas Pattern Jury Questions and Instructions, OIL, GAS & ENERGY RESOURCE LAW SECTION.

## 1.  Purpose of activity should be to restore or increase production

Typically, a lessee's actions will be considered "reworking operations" when the "activities conducted by the lessee to maintain the lease [are] of the nature that would cause the well to produce." *See Hydrocarbon Mgmt., Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d 427, 438 (Tex. App.—Amarillo 1993, no writ).

In *Hydrocarbon Management*, the Railroad Commission notified the operator that it had violated prior orders by overproducing the well's allowable and the operator was instructed to shut-in the well. *See id.* at 431. Upon request by the operator, the Railroad Commission agreed to permit the operator to produce the well at a reduced rate until the overproduction was made up. *See id.* A few months later, in May 1989, the Railroad Commission notified the operator that it had violated the well's reduced rate authority and the well was ordered to be shut-in. *See id.* However, one week prior to the operator's receipt of this notice, the well stopped producing for unknown reasons. No evidence was admitted to show whether the well was intentionally turned off or whether a purchaser refused to take production. *See id.* The lease provided that if production ceased the lease would not terminate if the lessee performed any drilling or reworking operations on the leased premises without a cessation of more than 60 days. *See id.* at 437.

The trial court found that there was a cessation of operations that spanned 70 days, resulting in the termination of the lease. The operator argued that it had conducted operations on the leased premises during this time, such as "removing tubing from the well to a supply house, selling junk tubing, cleaning up and filling pits on the location with the use of a back-hoe, and hauling tubing and other material from the well for storage."

Return to Table of Contents

*See id.* at 438. One witness at trial testified that these activities "were not actions that were more likely to make the well produce gas, or designed to re-equip the well." *See id.* A witness for the operator "admitted on cross-examination that workers simply picking up material around the well and driving them back to the yard, and not touching the wellhead, are not activities designed to change the status of the well nor to re-equip the well to cause it to produce gas." He also testified that "cleaning up the area with a backhoe is not an activity designed to change the status of the well." *See id.* Based on this testimony, the court held that the operator's conduct did not constitute "reworking operations" and could not be relied upon to save the lease from terminating. *See id.*

In contrast, the court in *Cox v. Stowers* held that the lessee's "good faith" activities were sufficient reworking operations to perpetuate the lease, even though about 28 months elapsed between the loss of production and the date production was restored. *See* 786 S.W.2d 102 (Tex. App.—Amarillo 1990, no writ). The issue considered by the court was whether activities conducted by the lessee constituted "reworking operations" that would be "sufficient to keep an oil and gas lease in force during its secondary term and while the only well, a gas well, was not in production." *See id.* at 102-103. The lease at issue provided that if, "after the discovery of oil or gas the production thereof should cease from any cause, this lease shall not terminate if the lessee commences additional drilling or reworking operations within sixty (60) days thereafter . . . ." *See id.* at 103. The court held that the term "reworking operations," as used in the lease, means "any and all actual acts, work or operations in which an ordinarily competent operator, under the same or similar circumstances, would engage in a good faith effort to cause a well or wells to produce oil or gas in paying quantities." *See id.*

In *Cox*, the lessee discovered in December 1984 that the pressure in the line was building up and restricting the flow of hydrocarbons. One month later the lessee determined it would need to perform an engineering study to determine the issue and what corrective action would be necessary. *See id.* In February 1985, the lessee injected fifty barrels of treating fluid to try to remove the "doming effect" and shut the well in to allow the fluid "to dissipate and to do its work on the dome." *See id.* Over the course of the next year, the lessee continued monitoring the pressure in the well and performing additional fluid treatments. *See id.* at 104. When fluid treatments alone would not restore production, the lessee connected a specially designed blower to the well which restored production in April 1986. The lessee testified that, based on his thirty-five years of experience, the methodology used by him was the correct method in restoring the well to production. *See id.* at 103. The lessee also testified that "the waiting periods and procedures . . . were necessary in the course of that treatment." The court held that the lessee's "treatment and activities were sufficient to constitute good faith reworking activities" commenced within the time period required to perpetuate the lease in the absence of actual production. *See id.* at 106.

Similarly, in *Hoke v. Tularosa, Inc.*, in a suit to cancel a lease, the lessors (collectively, "Hoke") sought a preliminary injunction which would prohibit the lessee from conducting operations on the leased premises during the pendency of the suit. 1986 Tex. App. LEXIS 7882. The lessor's application for a temporary injunction was denied by the trial court and Hoke pursued an interlocutory appeal on the sole issue of whether the trial court abused its discretion in denying the application. *See id.* at *4. On this issue, Hoke argued that he was entitled to a temporary injunction because the lessee had, in Hoke's opinion, failed to conduct reworking

Return to Table of Contents

operations when the lessee rerouted flowlines, moved onto the well site, and set in operation a portable pumpjack. *See id.* at *5-6. The court, noting that the "issue of whether or not the lease expired remains to be decided by the trial court," held that the trial court did not abuse its discretion in denying Hoke's requested relief. The appellate court concluded that prior to the date the lease would have terminated due to lack of production, "the lessee had set in motion the process of resuming production, and that such acts preliminary to the actual pumping of the oil were done *with the bona fide intention of proceeding with diligence* to cause the well again to produce." *See id.* at *6-7 (emphasis added).

## 2. Remedying issues other than those affecting the well to flow may not be sufficient

If the lessee is motivated by something other than restoring production, a court may find the activity cannot be considered "reworking operations" sufficient to maintain a lease. For instance, in *Schroeder v. Snoga*, the Texas Railroad Commission prohibited a lessee from producing or selling oil from its well until the well was brought into compliance with Commission rules. *See* 1997 WL 428472 (Tex. App.—San Antonio July 31, 1997, no writ). The Commission had made several previous demands on the lessee to bring the well into compliance, but the violations had persisted. *See id.* Three months after production ceased, the lessors placed a lock on the gate to the property and sought a declaration that the lease had terminated. *See id.* One of the arguments advanced by the lessee was that it performed reworking operations during the three month span during which there was no production. Evidence showed that the lessee had cleaned the tanks and motor, repaired the electrical system, and repaired a leak in the flow line. However, in rejecting the argument that the

activity constituted "reworking operations," the court found that the activities were "principally aimed at bringing the well into compliance with the [Commission] rules to avoid further penalty. These actions were not an attempt to restore productivity to an unproductive well." *See id.* The court held that these actions were insufficient as a matter of law to qualify as reworking operations which would maintain the lease. *See id.*

Similarly, in *Hall v. McWilliams* the court found a lease terminated when, in the absence of production, the lessee's activity on the leased premises was aimed at maintaining its equipment rather than restoring production to its well. *See* 404 S.W.2d 606, 609 (Tex. App.—Austin 1966, no ref'd n.r.e.). In *Hall*, the lessee's salt water injection permit was suspended by the Texas Railroad Commission, leaving the lessee with no method of disposing of the salt water produced by its well. *See id.* While searching for an alternative method of disposing of the salt water produced from its well, the lessee, during a three month period, only "started the motor on the well and pumped the well for about five minutes or long enough to pass fluid by the pump to keep it from sticking." *See id.* It was undisputed that there was no production of oil during this time. *See id.* The lessors claimed that the lease terminated because of this cessation of production. The court agreed, holding that the routine starting of a pump to keep it in "running operation" was not sufficient to constitute reworking operations to hold the lease. *See id.*

In contrast, the court in *Ramsey v. Grizzle* stated that "[a]ctual physical work being done on equipment in a good faith effort to place it in working order to produce oil constitutes sufficient operations to maintain the lease." *See* 313 S.W.3d 498, 510 (Tex. App.—Texarkana 2010, no pet.). The lessors argued that the only well on the property failed to produce from May 1, 2006 to

November 30, 2006, a span of seven months. *See id.* at 509-510. In support, the lessors offered evidence showing that the lessee "called for a workover rig to come out in April 2006, but that it did not get out to the well until October 2006 and claimed that this delay suggested that there was in fact no production during this time frame, resulting in a termination of the lease." However, a witness for the lessee testified at trial "that sometime in the summer of 2006, Grizzle spent $30,000.00–plus replacing casings and rods." *See id.* The jury determined that the work performed was sufficient "operations" to maintain the lease. *See id.* The *Ramsey* court declined to upset the jury verdict, stating if the lessee "did $30,000.00–$40,000.00 of work on the oil site in the summer in an effort to produce oil, presumably after June 30, 2006, it cannot be concluded that the jury finding is so against the great weight of the evidence as to result in a manifestly unjust result." *See id.* While the activity in this case was held to be sufficient, it should not be overlooked that this question was decided by a jury, not as a matter of law.

### 3. Lessee must commence reworking operations timely

Not only must a lessee's activities qualify as "reworking operations," but those activities must be conducted timely. In *Phillips Petroleum Co. v. Rudd*, the Texarkana Court of Appeals reversed and rendered judgment in favor of the lessee, Phillips Petroleum, finding the evidence sufficient to show "reworking operations" where the lessee brought a work-over rig onsite, "that a 'draw-works' was brought in, that the tubing was pulled, that a packer was set, that the well was swabbed more than once; and that it was acidized." *See* 226 S.W.2d 464, 467 (Tex. Civ. App.— Texarkana 1949, no writ). The court noted that additional evidence was presented, but was unnecessary because "the foregoing is sufficient to show that re-working operations

were in fact carried on." *See id.* After finding that the lessee's activity was sufficient to qualify as reworking operations, the court then considered whether the operations were conducted timely. *See id.* The well at issue was drilled on the land and was completed on May 8, 1948, but it was not a producer of oil or gas on the first test. The lessee continued efforts "to bring in the well as a producer, and on May 18 an official test was made by the Railroad Commission of Texas. The finding was negative." *See id.* The lease provided that if, at the expiration of the primary term, there is no well producing oil or gas, then the lease may be maintained if "the lessee is then engaged in drilling or re-working operations" on the leased premises without cessation of more than 30 consecutive days. *See id.* The only alleged cessation complained of spanned from June 10 to July 20. The court, having already determined that the lessee's actions were reworking operations, noted that evidence showed the well was acidized during this period. Accordingly, the court held that the lessee had in fact perpetuated the lease through its reworking operations and reversed the jury verdict which was in favor of the lessor and the court rendered judgment in favor of the lessee. *See id.* at 467.

## IV. PERPETUATING A LEASE WITH PRODUCTION

Typically, an oil and gas lease will be maintained by production, but sometimes problems can arise with the amount of production or a complete cessation of production may occur altogether. Texas law provides different methods to analyze situations where there is marginal production versus no production. Many times, whether a lease has terminated will present an issue that must be tried to a jury.

Return to Table of Contents

## A. Production in Paying Quantities

"If a well pays a profit, even small, over operating expenses, it produces in paying quantities, though it may never repay its costs, and the enterprise as a whole may prove unprofitable. Ordinarily, the phrase is to be construed with reference to the operator, and by his judgment when exercised in good faith." *Garcia v. King*, 139 Tex. 578, 583, 164 S.W.2d 509, 511-12 (1942). If the lease can no longer be operated at a profit a lessor will "not be required to suffer a continuation of the lease after the expiration of the primary period merely for speculation purposes on the part of the lessees." *See id.* at 513.

"Ordinarily, whether there has been 'paying production' is a fact question." *Evans v. Gulf Oil Corp.*, 840 S.W.2d 500, 503 (Tex. App.—Corpus Christi 1992, writ denied). "However, production in paying quantities may be established as a matter of law by showing a profit from the operation of the well." *Id.*

In determining whether the lessee is obtaining a profit from the well, the focus is on "whether the production yielding a profit after deducting operating and marketing costs." *See id.; see also EnerQuest Oil & Gas, LLC*, 981 F.Supp. 2d at 592 (same). "Included among operating costs are 'fixed or periodic cash expenditures incurred in the daily operation of a well,' such as 'taxes, overhead charges, labor, repairs, depreciation on salvable equipment, if any, and other such items of expense, if any.'" *EnerQuest Oil & Gas, LLC*, 981 F.Supp. 2d at 592 (citing *Pshigoda v. Texaco, Inc.*, 703 S.W.2d 416, 418 (Tex. App.—Amarillo 1986, writ ref'd n.r.e.). "Marketing costs include the cost of connecting the well to a pipeline." *See id.*

## B. The "Marginal Well" - Cessation of Production in Paying Quantities

"In the case of a marginal well . . . the standard by which paying quantities is determined is whether or not under all the relevant circumstances a reasonably prudent operator would, for the purposes of making a profit and not merely for speculation, continue to operate a well in the manner in which the well in question was operated." *Clifton v. Koontz*, 325 S.W.2d 684, 691 (Tex. 1949). In analyzing whether the operator is acting as a reasonably prudent operator, a court should consider "all matters which would influence a reasonable and prudent operator" including, but not limited to: (i) the depletion of the reservoir; (ii) the price for which the operator is able to sell; (iii) the "relative profitableness of other wells in the area;" (iv) the "operating and marketing costs of the lease;" (v) "net profit;" (vi) the "lease provisions;" (vii) "a reasonable period of time under the circumstances;" and "whether or not the lessee is holding the lease merely for speculative purposes." *See id.*

In 2012, the Pennsylvania Supreme Court analyzed *Clifton* and its application of its own "business judgment standard," stating "unless it can be established that [the operator] is not acting in good faith on his business judgment, but instead is acting with fraudulent or dishonest intent, he does not forfeit his rights under the lease based on difference in such judgment." *See T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261 (Pa. 2012). Similar to Texas courts, the Pennsylvania court declined to impose any "definite rule" to define the time period considered. *See id.* The court stated that when "production on a well has been marginal or sporadic, such that, over some period, the well's profits do not exceed its operating expenses, a determination of whether the well has produced in paying quantities requires consideration of the operator's good faith judgment in maintaining

operation of the well." *See id.* at 276. "In assessing whether an operator has exercised his judgment in good faith in this regard, a court must consider the reasonableness of the time period during which the operator has continued his operation of the well in an effort to reestablish the well's profitability." In *T.W. Phillips*, the lessors were able to show that there was a loss of $40 over a one year period. *See id.* at 278. The court, however, looked at the fact that this was an 80-year old lease and that there was no evidence the lessee had been acting in bad faith. As a result, the court concluded that the lease did not terminate. *See id.* at 277-278.

## C. Total Cessation of Production

"A 'total cessation of production' occurs when a well that has been producing gas ceases to produce any quantity of gas. When there has been a 'total cessation of production,' the two-prong 'cessation of production in paying quantities' analysis does not apply." *Cannon v. Sun-Key Oil Co., Inc.*, 117 S.W.3d 416, 421 (Tex. App.—Eastland 2003, pet. denied). "A total, physical cessation of production conveys an unambiguous message: either a well is in need of reworking or repair, or it has permanently drained the reservoir. In either case, it is more reasonable in such circumstances to expect the operator to take immediate action or suffer termination of the lease." *Ridenour v. Herrington*, 47 S.W.3d 117, 122 (Tex. App.—Waco 2001, pet. denied) (citing *Bachler v. Rosenthal*, 798 S.W.2d 646, 650 (Tex. App.—Austin 1990, writ denied)). "Cessation of production for the number of consecutive days stated in the lease's cessation-of-production clause automatically terminates the lease, without regard to the reasonableness of the operator's actions." *Id.*

Many leases provide that the lease will terminate if a cessation lasts more than a specific number of days, such as 60 days or 90 days. If there is a cessation of production for longer than permitted by the terms of the lease, then, absent some other savings provision, the lease may automatically terminate without the need for any legal action by the lessors. *See Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 553 (Tex. App.—San Antonio 2011, no pet.).

## D. The Temporary Cessation of Production Doctrine

Texas courts have developed the "temporary cessation of production" doctrine ("TCOP") to "mitigate the harshness of the automatic termination rule" imposed when a well ceases to produce. *See Red River Res. Inc. v. Wickford, Inc.*, 443 B.R. 74, 81 (E.D. Tex. 2010) (citing *Watson v. Rochmill*, 137 Tex. 565, 155 S.W.2d 783, 784 (1941)). "For the TCOP doctrine to apply, the lessor must prove an actual cessation of production; thereafter, the burden shifts to the lessee to prove that the cessation was excused by the doctrine. Courts often apply a two-prong test for determining whether the doctrine should apply. First, the lessee must prove that the cessation was 'due to a sudden stoppage of the well or some mechanical breakdown of the equipment used or some mechanical breakdown of the equipments used in connection therewith, or the like'; and, second, the lessee must exercise diligence to resume production within a reasonable time." *Id.* (citing *Cobb v. Natural Gas Pipeline Co. of Am.*, 897 F.2d 1307, 1309 (5th Cir. 1990)). However, the TCOP doctrine will not apply when the lease contains "a provision in the habendum clause expressing a time limitation within which continued drilling ... must be conducted." *See id.* "What constitutes a reasonable time will of course depend on the particular facts presented." *Cobb*, 897 F.2d at 1309.

In *Red River Resources*, the court held that the TCOP doctrine did not apply to save the lease because the lease contained a habendum clause which provided that the lease would be "null and void" if, after the expiration of the primary term, oil and/or gas was not produced in "commercial quantities" as that term was defined by the lease." *See Red River Res. Inc.*, 443 B.R. at 83.

In *Ridge Oil v. Guinn*, the Texas Supreme Court addressed the applicability of the TCOP doctrine to a lease which had been partially assigned. As discussed in more detail above in Section III.A.2, Ridge Oil operated one tract covered by the lease where two producing wells were located. Guinn was the operator of the second tract covered by the lease, but no producing well was located on this tract. When Ridge Oil shut-in its wells and took new leases from the mineral owners, Guinn argued, in part, that the original lease should be held in force and effect by the TCOP. *See Ridge Oil v. Guinn*, 148, 149 S.W.3d 143 (Tex. 2004). First, the court found that the TCOP could apply between "partial assignees of a lessee's interest." *See id.* at 151. In order to determine whether the TCOP could save Guinn's leasehold interest when production from the Ridge Oil tract intentionally ceased, the court first addressed whether Guinn was required to prove that the cessation of production was caused by an unforeseeable mechanical breakdown. *See id.* at 151-152. While many Texas cases do hold that a party would need to prove that an unforeseeable mechanical breakdown occurred, the Supreme Court concluded that such would not always be the case, noting that the TCOP doctrine "applies in a wide variety of circumstances," citing several example. *See id.* In fact, the Supreme Court stated that the appellate court had correctly found that such facts were not necessary in this case, explaining:

"[A]lthough decisions at times have said that the temporary cessation of production doctrine applies when there is 'sudden stoppage of the well or some mechanical breakdown of the equipment used in connection therewith, or the like,' or that the doctrine applies when the cause of a cessation of production is 'necessarily unforeseen and unavoidable,' the circumstances in which this and other courts have applied the doctrine have not been so limited. The court of appeals in the present case correctly concluded that 'foreseeability and avoidability are not essential elements of the [temporary cessation of production] doctrine.'" *See id.* at 152 (internal citations omitted).

Although finding that the TCOP doctrine could apply to save Guinn's leasehold interest upon proper proof, the court held that the necessary proof was lacking because there was a *permanent* rather than *temporary* cessation of production. The court concluded that the permanent cessation occurred when Ridge Oil's new leases took effect because all production from the premises thereafter was from property covered by the new leases and there was no production from the acreage covered by Guinn's lease. *See id.*

Some members of the Texas Supreme Court have called for a modification of the TCOP doctrine which would permit a lessee to take advantage of the doctrine, not only when it experiences an unforeseen mechanical breakdown, but also when there are "market-based interruptions in production." *See Natural Gas Pipeline Co. v. Pool*, 124 S.W.3d 188, 205 (Tex. 2003) (Jefferson, J., dissenting). The dissenting justices argued that the historical applications of the doctrine have been "disproportionately favorable to the lessor, arbitrary, inequitable, and harsh." *See id.* The justices suggested that the TCOP

doctrine should be modified to permit a lessor to shut-in a well to take advantage of market conditions, such as shutting in a well during months with low prices and producing the maximum allowable when prices are higher. *See id.* Time will tell whether such a modification will ever occur.

## V. PERPETUATING A LEASE WITHOUT ACTIVITY ON THE LEASED PREMISES

A lessee may be able to maintain its lease or several leases through lease provisions which provide for "constructive" production. For instance, a lessee can "pool" several leases together so that production on one lease maintains all other leases pooled with it. Further, many leases provide that a lease can be maintained by operation of a shut-in royalty provision and/or a force majeure clause.

### A. Pooling

In reviewing a lessee's decision to pool, there are two considerations. First, whether pooling strictly complies with the terms of the lease. Second, whether a reasonably prudent operator would pool in the manner the authority was exercised.

"A lessee has no power to pool without the lessor's express authorization, which is usually contained in the lease's pooling clause. For pooling to be valid, it must be done in accordance with the method and purposes specified in the lease. A lessee's pooling decision will be upheld unless the lessee pools in bad faith." *Se. Pipe Line Co., Inc. v. Tichacek,* 997 S.W.2d 166, 170 (Tex. 1999) (citing *Jones v. Killingsworth,* 403 S.W.2d 325, 327-28 (Tex.1965)). "The primary legal consequence of pooling is that production and operations anywhere on the pooled unit are treated as if they have taken place on each tract within the unit." *See id.*

(citing *Southland Royalty Co. v. Humble Oil & Ref. Co.,* 151 Tex. 324, 249 S.W.2d 914, 916 (1952); *see also Key Oper. & Equip. Co. v. Hegar,* 2014 WL 2789933 (Tex. April 4, 2014) (reaffirming that operator of pooled unit has the right to use all surface in unit, regardless of whether the surface being used is over the minerals being produced)). "[I]f the unit is not pooled in good faith, production will be considered to take place only on the actual tract upon which it occurs, and production from a unit well will not maintain off-site leases." *Id.*

### 1. Must be acting in good faith

A lessee who exercises its pooling authority must do so in good faith. *See Coastal Oil & Gas Corp. v. Garza Energy Trust,* 268 S.W.3d 1, 21 (Tex. 2008). In *Coastal Oil,* the lease provided that the lessee could pool "at its option" when, "in its judgment," pooling was "necessary or advisable ... in order properly to explore, or to develop and operate said leased premises in compliance with the spacing rules of the Railroad Commission of Texas." *See id.*

In reviewing a lessee's use of its pooling authority, the trier of fact will generally consider, among other things, evidence of the configuration of the unit, whether expiration of the primary term of the lease is imminent at the time of the pool designation, and whether geologic factors were considered. *Elliott v. Davis,* 553 S.W.2d 223, 227 (Tex. Civ. App.—Amarillo 1977, writ ref'd n.r.e.).

"Failure to consider geology in forming a pooled unit, pooling in order to maintain leases past their primary term, and the inclusion within a unit of nonproductive acreage or acreage outside a well's drainage pattern are all factors that can support a finding of bad faith pooling." *PYR Energy Corp. v. Samson Res. Co.,* 470 F. Supp. 2d

709, 725 (E.D. Tex. 2007) (citing *Amoco Production Co. v. Underwood*, 558 S.W.2d 509 (Tex. Civ. App.—Eastland 1977, writ ref'd n.r.e.); *Elliott v. Davis*, 553 S.W.2d 223 (Tex. Civ. App.—Amarillo 1977, writ ref'd n.r.e.); *Circle Dot Ranch, Inc. v. Sidwell Oil & Gas, Inc.*, 891 S.W.2d 342 (Tex. App.—Amarillo 1994, writ denied)). The *PYR* court went on to find that "[l]ogically, such factors could also support a finding of failure to act as a reasonably prudent operator." *See id.*

A lessee seeking to hold nonproductive acreage should be prepared to defend its decision, which may result in a question ultimately decided by a jury. For instance, in *Coastal*, the jury found that the pooled units formed by Coastal were formed in bad faith and the appellate court affirmed this finding. The lessors argued that the units created by Coastal were created in bad faith because they allegedly were disproportionately favorable to Coastal. *See id.* The court did not pass on whether Coastal's actions, as a matter of law, could be held to be bad faith. However, the court did find that the evidence was sufficient to affirm a jury finding of bad faith. *See id.*

## 2. Must be within granted authority

Older leases may not provide sufficient pooling authority for the efficient drilling of horizontal wells. Courts typically examine the lessee's exercise of its pooling authority by reference to the terms of the lease, not whether the lessee acted as a "reasonably prudent operator." *See Browning Oil Co., Inc. v. Luecke*, 38 S.W.3d 625, 641 (Tex. App.—Austin 2000, pet. denied) ("The reasonably prudent operator standard is used in the context of a lessee's performance of implied covenants. These implied covenants, however, are subject to the express terms in the contract.").

For instance, in *Browning Oil Co. v. Luecke*, a 1979 lease authorized the lessee to pool subject to an "anti-dilution clause" requiring that the leased premises comprise at least 60 percent of any pooled unit. *See* 338 S.W.3d 625, 636 (Tex. App.—Austin 2000, no pet.). In 1985, the lessee's pooling authority was amended to provide that the lessee could create a unit comprised of at least 60 percent of lands owned by the lessor, rather than just lands subject to the specific lease. *See id.* However, the 1985 amendment also required that the lessee utilize the smallest spacing requirements permitted by the field rules, which in this case was 80 acres. *See id.* In 1995, the lessee created an 839.18-acre pooled unit, but included only 268.68 acres owned by the lessor. *See id.* at 638. The lessor filed suit, claiming the lessee breached the lease's pooling provision by exceeding its authority. The lessee made several arguments in defense, one of which was that it "did not have the option of creating eighty acre units because they have a duty to develop and protect the leased tracts as would a reasonably prudent operator under the same or similar circumstances, and no reasonably prudent operator would have drilled a horizontal well on an eighty acre unit. The reasonably prudent operator standard is used in the context of a lessee's performance of implied covenants." *See id.* at 641. The court rejected this argument, noting that authority to pool is subject to the express terms of the contract and "cannot be expanded by an implied covenant" to act as a reasonably produce operator. *See id.*

In a recent dispute before the Texas Railroad Commission, EOG Resources, Inc. ("EOG") sought a permit to drill an "allocation well" that would traverse two separate leased premises, which EOG did not have the right to pool for oil production. The lessors (herein, collectively "Klotzman") opposed the permit application and the matter was set to be heard by the Hearings Division of the Railroad Commission of Texas as Oil & Gas Docket No. 02-0278952. According to

the proposal for decision issued by the Hearing Examiners in this matter (herein, the "PFD" and available at http://www.rrc.state.tx.us/media/11191/02-278952-mfe-pfd.pdf.), the parties agreed that the applicable leases did not authorize EOG to pool the leases for production of oil, but disputed whether a well permit could be granted absent such authority when the horizontal lateral would traverse two separate leased premises EOG made several arguments, but primarily contended that it had the legal right to drill a horizontal well on both leases and, to the extent there is an issue of allocation of royalty, such would be a private matter to be determined by the leases or by a district court. *See* PFD, p. 8. Klotzman, on the other hand, argued that EOG's use of the term "allocation" was meant merely "to obscure the fact that what is really going on is unauthorized pooling." *See id.*, p. 14. The Examiners agreed with Klotzman, finding EOG's actions were the "very definition of pooling" and concluding that EOG's permit application should be dismissed because, in the Examiner's opinion, EOG did not have a good faith basis to drill the proposed well absent sufficient pooling authority. *See* PFD, 25-26. However, in September 2013, the Railroad Commission later voted to reject the Examiner's PFD and to unanimously approve EOG's permit application. The order rejecting the PFD did not provide reasons for the Commissioners' decision. However, comments made during the hearing suggested that the decision was influenced by the threat of waste as well as the remedies available to Klotzman at law. Many of the issues raised in the Klotzman protest proceeding remain unanswered.

## B. Shut-in Royalties

Generally, "a shut-in royalty clause 'provides for a substitute or contractual method of production, which will maintain the lease in force and effect when a gas well is drilled *and* for which no market exists.'" *See Hydrocarbon Mgmt., Inc.*, 861 S.W.2d at 432 (citing Richard W. Hemingway, *The Law of Oil and Gas* § 6.5, at 304 (2d ed. 1983) (Hemingway). "The shut-in royalty is considered constructive production and will maintain the lease if its terms are satisfied." *See id.* (citing *Archer County v. Webb*, 326 S.W.2d 250, 255 (Tex. Civ. App.—El Paso 1959), *aff'd*, 161 Tex. 210, 338 S.W.2d 435 (1960)).

However, being a matter of contract, the parties to the lease can alter many of the characteristics of the shut-in royalty clause as described by the *Hydrocarbon Management* court, such as (i) the specific circumstances triggering the shut-in royalty clause, (ii) how the payments must be tendered, and (iii) the consequence of failing to make timely payments. For instance, as mentioned above, this result can be altered by an express agreement between the parties. *See PNP Petroleum*, (shut-in royalty payments authorized when no wells are capable of producing in paying quantities because payments are expressly authorized in the terms of the lease).

"Courts construe shut-in royalty clauses strictly, and the lease language determines whether a failure to pay shut-in royalties will terminate a lease." *Fain Family First Ltd. P'ship v. EOG Res., Inc.*, 02-12-00081-CV, 2013 WL 1668281 (Tex. App.—Fort Worth Apr. 18, 2013, no pet.). "If the lease makes proper payment the constructive production, then if the payment is not made correctly the lease terminates." *Id.* (citations omitted). "Thus, when the shut-in royalty clause couples an optional payment with a provision stating that 'it will be considered that gas is being produced' if the payment is made, the lessee must make timely payment or the lease will terminate." *Id.*

## 1. Capable of flowing

For a well to be "capable of producing in paying quantities," permitting the payment of shut-in royalties, it must be capable of production when it "is turned 'on' and it begins flowing, without additional equipment or repair. Conversely, a well would not be capable of producing in paying quantities if the well switch were turned 'on,' and the well did not flow, because of mechanical problems or because the well needs rods, tubing, or pumping equipment." *See Anadarko v. Thompson*, 94 S.W.3d 550, 557 (Tex. 2010) (approving of the definition provided in *Hydrocarbon Mgt., Inc. v. Tracker Expl., Inc.*, 861 S.W.2d 427, 433-34 (Tex. App.— Amarillo 1993, no writ). "[A] well must have traits conducive to, *features permitting, or having attributes required to* produce an amount of production sufficient to pay the lessee a profit, even small, over the operating and marketing expenses, although the cost of drilling the well may never be repaid." *See Hydrocarbon Mgmt., Inc.*, 861 S.W.2d at 434 (citing *Garcia v. King*, 139 Tex. 578, 164 S.W.2d at 511) (emphasis original).

In *EnerQuest Oil & Gas, LLC v. Plains Exploration & Prod. Co.*, the court determined that Texas law did not focus "on whether oil or gas could be 'captured' or made 'marketable,'" but rather looked at "whether oil or gas would 'flow' when the well is turned on . . . ." *See* 981 F. Supp. 2d 575, 590 (W.D. Tex. 2013) *reconsideration denied*, SA-12-CV-542-DAE, 2014 WL 1652599 (W.D. Tex. Apr. 24, 2014) (citing *Hydrocarbon Mgmt., Inc.*, 861 S.W.2d at 433-34). The court concluded "that the lack of surface facilities, or the fact that surface facilities may need repair, does by itself not render a well incapable of production." *See id.* The lessee in *EnerQuest* had performed tests on two old oil wells which were on the property when it originally acquired the lease. *See id.* at 582. Shortly before the end of the primary term, the

lessee reclassified the old oil wells as new gas wells and then pooled multiple leases into a single gas unit. *See id.* The lessee took no new action until after the expiration of the lease's primary term. After the primary term expired, and before any production was obtained from the wells, the lessee tendered shut-in royalty payments which were rejected by the lessors. About nine months after the end of the primary term, and seven months after the shut-in royalty payments were rejected, the lessee paid to have the wells connected to a pipeline so that the gas could be marketed. *See id.* at 583.

In a suit to have the leases cancelled, the lessors argued that shut-in royalties were insufficient to maintain the lease because the wells were not capable of producing in paying quantities at the time the shut-in royalties were first tendered. *See id.* at 587-588. Specifically, the parties disputed whether a "lack of surface facilities is a relevant factor" in determining if a well is capable of producing in paying quantities. *See id.* at 588. At the time the well was shut-in, there was no separator, meter run, or flowline. *See id.* The lessee contended that the presence of surface facilities is irrelevant, and further contended that the court's focus should be on the well, only, which should be "fully equipped and operational," but that all equipment downstream from the well should not be required to be operational. *See id.* In response, the lessors contended that the absence of surface facilities renders the wells incapable of producing in paying quantities as a matter of law. *See id.* Essentially, the lessors argued that "in order to 'produce' a well, the operator must actually take oil or gas from the well in a captive state for either storing or marketing the product for sale." *See id.* The court was not persuaded by the lessor's argument that the gas would be lost into the atmosphere if the well were turned on without the required surface facilities. *See id.* Instead, the court determined that the proper

inquiry was whether hydrocarbons would flow to the wellhead if the well were turned on. *See id.* Where that production goes after reaching the wellhead would not be considered. *See id.*

In *EOG Resources, Inc. v. Killam Oil Co., Ltd.*, EOG asked the court to apply a different standard, arguing that the meaning of the phrase "'capable of production' may change depending on the context in which the phrase is used." *See* 239 S.W.3d 293, 303 (Tex. App.—San Antonio 2007, pet. denied). The court disagreed and found that the definition approved by the Texas Supreme Court in *Anadarko* would control. *See id.*

## 2. Capable of paying quantities

In addition to being able to produce, Texas law generally requires that the well be capable of producing in paying quantities, "which means there must be 'facilities located near enough to the well that it would be economically feasible to establish a connection so that production could be marketed *at a profit.*'" *See EnerQuest Oil & Gas, LLC*, 981 F. Supp. 2d at 587.

In *Blackmon v. XTO Energy*, the Court of Appeals in Waco held that production in paying quantities focuses only on the *quantity* of hydrocarbons produced, not whether the hydrocarbons are of marketable *quality. See Blackmon v. XTO Energy*, 276 S.W.3d 600, 604 (Tex. App.—Waco 2008, no pet.). In 1983 the Blackmon's predecessor in title executed an oil and gas lease covering two adjoining tracts, one being a 33.5-acre tract and the other being a 101.5-acre tract. *See id.* at 602-603. A unit was formed for the Biggs #1 Well which was a producing well that held the lease beyond its primary term. *See id.* at 602. Production ceased in April 1997 "because the third party (Texas Utilities Fuel Company) which had been purchasing the gas produced from this well refused to continue

because the carbon dioxide content was greater than three percent, which was contrary to the specifications of the purchase contract." *See id.* at 602-603. The lessee at the time "installed an amine processing unit in September 1998 which removed the excess carbon dioxide from the gas, and production resumed." *See id.* at 603. The Blackmon's argued that the well was not capable of production in paying quantities "because it needed additional equipment or repairs in order to produce *marketable* gas." *See id.* (emphasis original). EOG, who as the lessee at the time of the lawsuit, argued that the amine processing unit was "added downstream of the wellhead," and thus "was not the type of 'additional equipment' necessary to enable gas to flow from the wellhead in a producing quantity." *See id.* at 604.

While courts will look at the quantity, not the quality, of the oil and/or gas produced, a court will also focus on the quantity the well could produce *on the date it was shut-in*, not the quantity of production possible with additional equipment or repair. *See EnerQuest Oil & Gas*, 981 F. Supp.2d. at 594-595. Although finding the lack of surface facilities would not render a well incapable of producing when turned "on," the *EnerQuest* court stated that "the paying-quantities analysis must still look to the quantities of oil and/or gas the Well would have produced *if it had been turned 'on' on the date it was shut in;* its capability with additional equipment or repair is not relevant." *See id.* at 595 (emphasis original). The court stated that the "relevant question is whether the Well was capable of producing in quantities sufficient to recoup the cost of the pipeline hookup and other operating and marketing costs *if it had produced long term in the state it was in at the end of the Leases' primary terms*, not what it was capable of producing after additional equipment was installed and repairs were performed at a later time." *See id.* at 594

(emphasis original). Further, the lessee must be able to recoup its marketing and operating costs within "a reasonable time," unless it could be shown that a reasonable operator would continue to operate the well for profit and not for speculation. *See id.* at 593.

EnerQuest offered evidence of the profit obtained once the well began actual production. However, the court noted that, during the period between the shut-in date and the date of first production, EnerQuest performed work that increased the well's production, such as acidizing and swabbing the wellbore, which "more than doubled [the well's] rate of production." *See id.* at 594. The well was also "worked over" during this time period "to install a rod pump, and at the same time, replace the tubing string" which also increased the rate of production. *See id.* The parties' respective experts argued about whether the acidizing and swabbing operations constituted additional "equipment" or "repairs," requiring that the court ignore the increase in production when determining whether the well was capable of producing in paying quantities. The court held that the conflicting expert testimony on this subject raised a fact issue which would need to be determined by the trier of fact as well as whether EnerQuest would have recouped its marketing and operating costs "within a reasonable time." *See id.*

When the question of whether a well could "flow" in paying quantities is presented to a jury, the issue will likely turn on expert testimony. *See AFE Oil & Gas, L.L.C. v. Armentrout*, 2-07-100-CV, 2008 WL 623980 (Tex. App.—Fort Worth Mar. 6, 2008, pet. denied). In *AFE Oil & Gas*, the primary term on a lease covering land in the Barnett Shale was set to expire on August 1, 2003. Two days prior, on July 30, 2003, the operator began operations on the well. In August 2003, the well was acid perforated, "a technique used to stimulate production of a gas well."

*See id.* at *2. In October 2003, the lessee and the operator tendered shut-in royalties to their respective lessors, which were rejected. The issue centered on whether the well was capable of producing in paying quantities on the date it was shut-in. The lessors presented testimony at trial that a gas well in the Barnett Shale would not produce in paying quantities without a fracture stimulation ("frac") and that the well had not been "fraced" by the end of the primary term. *See id.* *3. The lessors also elicited testimony from AFE's representative who testified with respect to this well "he would have had to hire a service company, frac the well, and do mechanical work on it to get the well to produce, all of which had to be done after October 2003." *See id.*

While the court put significant emphasis on this testimony, the court almost seemed more interested in the primary expert witnesses for each side. The lessor's expert testified that in August 2003 the well would not have flowed on its own and that it was incapable of producing without being "fraced." He based his opinion, in part, on his experience which included being involved in the completion of "probably about a thousand wells in the last ten years" in the Barnett Shale. *See id.* In stark contrast to the lessor's expert, the AFE's expert "testified that he had experience with completing and overseeing only one gas well in the Barnett Shale." *See id.* The court was also critical of AFE's expert's demeanor on the stand. The court's comparison and contrast of the experience and demeanor of the respective experts highlights the importance of choosing an expert witness for trial.

Something that is unclear from the facts in *AFE Oil & Gas* is why the operator chose to perform an acid perforation rather than hydraulically fracture to stimulate the well. It appears from the opinion that no party provided testimony as to why this course of action was chosen, such as whether the

operator in good faith believed it to be an effective course of action or whether it was driven by unavailability of a service company. However, AFE's expert did testify that, in his opinion, the acid perforation was "sufficient pressure to break the formation" and that the well would have been capable of flowing. *See id.* at *5. While proof of these matters, if true, might not have changed the ultimate outcome, they might have provided AFE other arguments to perpetuate the lease.

### 3. Effect of Non-Payment

"Non-payment of royalty will not typically terminate a lease, 'in the absence of a specific clause to that effect.'" *Blackmon*, 276 S.W.3d at 606 (citing *Coastal Oil & Gas Corp.*, 28 S.W.3d at 763 (quoting *Morriss v. First Nat'l Bank of Mission*, 249 S.W.2d 269, 279 (Tex. Civ. App.—San Antonio 1952, writ ref'd n.r.e)). However, failure to timely pay shut-in royalties more commonly results in termination than failure to pay royalties on production. *See id.* In *Blackmon*, it was undisputed that the lessee during the time the well was shut-in did not tender shut-in royalty payments to the lessors. The shut-in royalty provision provided, in part, that "[i]f, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to one dollar ($1.00) for each acre of land then covered hereby." *See id.* at 605. Based on the undisputed fact that shut-in royalty payments were not made, the lessors argued the lease terminated. *See id.* at 607. However, the court disagreed. The court discussed Texas law applicable to interpreting covenants and conditions in oil and gas leases and concluded that the proper construction of the lease at issue resulted in the shut-in royalty to impose an obligation to pay, the breach of

which gave rise to liability for money damages. It did not result in the termination of the lease. *See id.*

### C. Force Majeure

"The theory of force majeure has been existent for many years. Often likened to impossibility, it historically embodied the notion that parties could be relieved of performing their contractual duties when performance was prevented by causes beyond their control, such as an act of God." *Sun Operating Ltd. P'ship v. Holt*, 984 S.W.2d 277, 282-83 (Tex. App.—Amarillo 1998, pet. denied) (citing 6A Corbin, Corbin on Contracts § 1324 (1962)). "But, much of its historic underpinnings have fallen by the wayside. Force majeure, is now little more than a descriptive phrase without much inherent substance. Indeed, its scope and application, for the most part, is utterly dependent upon the terms of the contract in which it appears." *Id.* "When the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure." *Id.*

In *Sun Operating*, production ceased from the wells because the gas purchaser stopped taking production because it was performing "major repairs and renovations" on the pipeline used to transport the lessee's gas. *See id.* at 280-281. Because production ceased for more than 60 days, the time period provided for in the habendum clause, the lessors filed suit to cancel the lease. *See id.* at 281. The court held that the force majeure clause prevented the lease from terminating. *See id.* at 283. Moreover, the court held that lessee had no duty to prove that it could have overcome the interruption of production by use of reasonable diligence where the lease did not require same, though triggering the force majeure provisions must have been

outside the lessee's control. *See id.* at 283, 288.

"Under the force majeure clause, rules or regulations of governmental authority which prevent the lessee from complying with the lease covenants constitute an excuse for non-performance." *Schroeder v. Snoga,* 04-96-00489-CV, 1997 WL 428472 (Tex. App.—San Antonio July 31, 1997, no writ). However, if a lessee's violation of Commission rules or regulations results in a shut-in order, "courts are unwilling to allow the lessee to gain the benefit of the force majeure clause when the shut-in order was due to the lessee's action or inaction." *See id.*

In *Red River Resources,* the court held that a Railroad Commission severance order "does not constitute a *force majeure* event when compliance with the regulation violated was within the reasonable control of the lessee." *See* 443 B.R. 74, 80 (E.D. Tex. 2010). "The RRC has the authority to order a well shut-in due to the lessee's failure to comply with its regulations. To accomplish this, the RRC issues severance orders." *Id.* The court stated that a severance order "will only qualify as a force majeure event when compliance with the RRC regulation violated was outside the control of the lessee. In *Red River Resources,* production on the Belcher lease ceased in March 2008 as a result of a severance order "for improper plugging techniques" and the order was lifted on January 20, 2009. *See id.* at 78. The court found that issuance of this order was outside the lessee's control because the evidence suggested that a Railroad Commission employee had "expressly approved" of the plugging technique before declaring it was improper and the well was ordered to be shut-in. *See id.* at 80 n.3. As a result, the court concluded that the force majeure clause and the cessation of production during this time period was excused. *See id.* at 80. "However, four days earlier, on January 16, 2009, the RRC issued another severance order on the Belcher lease for production

imbalances. The RRC lifted the second severance order on March 25, 2009." *Id.* at 78. In contrast to its decision on the first severance order, the court held that issuance of the second severance order was in the lessee's control and therefore the cessation of production occurring as a result would not be excused as a force majeure event. *See id.* at 80-81.

In *Allegiance Hillview, L.P. v. Range Texas Prod., LLC,* the court held that Range was entitled to seek protection of a force majeure clause in a surface use agreement ("SUA") when the City of Denton made a notification error resulting in the hearing on Range's permit application to be delayed until after deadline for Range to commence drilling operations. 347 S.W.3d 855 (Tex. App.—Fort Worth 2011, no pet.). The SUA was entered into on July 11, 2008 and required Range to commence drilling operations no later than July 11, 2009 because the surface owner wanted to develop the surface for its own purposes. *See id.* at 858-859. The SUA identified a single location for a drill site which ultimately posed several problems to Range. *See id.* at 859-860. For instance, in order to properly develop the property, Range was required to seek leases from neighboring landowners, deal with several title issues, and seek three "set-back waivers" because of the proposed drill site's proximity to three residences. *See id.* Each of these issues required Range to spend time negotiating with the mineral owners and the home owners in order to obtain the required agreements. Range began the application process with the City by April 16, 2009. The City provided public notice on May 7, 2009 that Range's application would be considered at the May 20, 2009 hearing. However, the notice posted by the City included incorrect information and did not discover this error until May 26. As a result of this notification error, the City was required to provide the correct notice and reschedule the hearing on Range's application

to July 21 — which was 10 days after the deadline for Range to commence drilling operations. On June 29, 2012, Range notified the surface owner that Range believed the notification error was an event of force majeure. *See id.* at 863-864.

The surface owner argued that Range's inability to meet the drilling deadline was not caused by City's notification error, but was instead the result of Range not filing its application "timely," as required by the SUA. *See id.* at 866-867. Essentially, but for Range's alleged delay in filing its application (something in Range's control), the permit could have been obtained and drilling deadline met. The court noted that the "facts of this case present a close call." *See id.* at 872. In the end, the court concluded that whether or not Range timely filed its application presented a fact question of whether its actions under the circumstances were reasonable. Because the trier of fact concluded that Range's actions were reasonable, the appellate court affirmed the judgment in favor of Range.

## VI.    Conclusion

Termination lawsuits, even the threat of such a lawsuit, can pose operational and financial stress on a lessee. If a well is being drilled (or has already been drilled) the stakes can be very high. While a lessee cannot foresee every potential future threat or complaint, there are several strategies a lessee can implement to help combat a lease termination lawsuit or, better yet, avoid the claim altogether. As mentioned above, the available arguments are generally not held to be exclusive, and can be asserted in the alternative.

After the lease is executed, one of the most effective strategies to avoiding a termination suit is simply being familiar with the express terms of the applicable lease, including any definition of an industry term, the type of activity and/or production required to perpetuate the lease, and what additional options (ie, pooling, shut-in royalties, savings clauses) are made available by the lease and how to exercise them.

Avoiding lease termination suits begins when the lease is prepared. When negotiating an oil and gas lease a lessee should keep in mind potential issues that may arise. For instance, if the lessee is in an area where it will be difficult to get the necessary people or equipment, the lessee may want to draft any "operations" broadly. A lessee should also consider whether the force majeure clause should be triggered by events like the unavailability of service companies and/or drilling rigs. Additionally, the availability of a market (or lack thereof) may impact how the shut-in royalties clause should be drafted.

Of course, the lessee will likely not get everything it wants into the terms of lease and, even with the most diligent adherence to the lease, problems will invariably arise. Such problems could be caused by the unavailability of oilfield service companies, unforeseen mechanical breakdowns, or changes in market conditions, or in many other ways which may be outside the lessee's control. While some or all of these issues may not be necessarily foreseeable, the lessee should attempt to respond quickly with diligence until the problem is resolved.

Finally, maintaining a lease brings together many different and overlapping issues, many of which are beyond the scope of this paper. For instance, even in the face of a termination suit, the lessee may have several defenses available to it, such as estoppel, ratification, waiver, and adverse possession. Again the key is to remain vigilant in understanding the lease terms and diligent in conducting operations to accomplish the principal purpose of the lease, to make money for the lessor and lessee from the production and sale of oil and gas.