Curtis HICKEY et al., Appellants,

v.

Charles SPANGLER et al., Appellees.

No. 7380.

Court of Civil Appeals of Texas.

Texarkana.

May 22, 1962.

Rehearing Denied June 12, 1962.

Fulton & McClain, Gilmer, LeRoy La-Salle, Ruff Wall, Fred Whitaker, Carthage, for appellants.

Tom Bankhead, Carthage, Wardlow W. Lane, Center, for appellees.

CHADICK, Chief Justice.

This action originated as a trespass to try title suit to recover the mineral lease-hold estate in a small tract of land. A judgment based on jury answers to special issues was entered and the plaintiffs in the trial court have appealed. The judgment is reversed and the case remanded for new trial.

Curtis Hickey and R. H. Lee, as plaintiffs, brought the suit naming Charles Spangler and sixteen others as defendants. Brief reference to the pleadings and evidence sufficient only to suggest the nature and scope of the suit is made at this point; a more detailed statement where pertinent to questions discussed will be made as the occasion arises. The plaintiffs allege that an oil, gas and mineral lease with a primary term of thirty days executed by Hickey and assigned to Spangler and the other defendants terminated in accordance with the terms of the instrument prior to the institution of the suit. Relief by way of receivership, temporary restraining order, temporary and permanent injunction, cancellation, etc., was sought. The defendants answered by a general denial and plead their title, estoppel, joint adventure, mutual mistake, for reformation of the lease, improvements made in good faith, etc., and for relief appropriate thereto.

The Hickey mineral lease was dated September 8, 1959, and provided for a primary term of thirty days from date. Paragraph 6 of the lease is in this language:

"6. If prior to discovery of oil, gas or other mineral on said land or Lessee should drill a dry hole or holes thereon, or if after discovery of oil, gas or

other mineral, the production thereof should cease from any cause, this lease shall not terminate if Lessee commences additional drilling or reworking operations within sixty (60) days thereafter, *or if at the expiration of the primary term, oil, gas or other mineral is not being produced on said land, or on acreage pooled therewith, but Lessee is then engaged in drilling or reworking operations thereon or shall have completed a dry hole thereon within sixty (60) days prior to the end of the primary, term, the lease shall remain in force so long as operations are prosecuted with no cessation of more than sixty (60) consecutive days, and if they result in the production of oil, gas or other mineral, so long thereafter as oil, gas or other mineral is produced from said land or acreage pooled therewith * * *.*" (Last sentence omitted as it pertains to other contingencies. Emphasis added.)

Exploration was begun within the primary term of the lease, and a well capable of producing oil and gas in commercial quantities was completed January 20, 1960, 105 days after expiration of the primary term. No contention is made that the lease expired before completion date.

The well was shut in at completion. However, at that time a switcher was hired, and from the completion date until the appellees were enjoined from going on the leased premises the switcher opened the well's controls at least once each week and allowed the gas to blow and be burned. Flaring the well was thought necessary to keep it from logging up and being killed by salt water or other liquid.

Commencing the week of completion Spangler continuously negotiated for a gas sales contract with four separate purchasing companies. The negotiations resulted in the execution of a contract on July 18, 1960, to sell the gas produced from the well to Tennessee Gas Transmission Company. Immediately following completion of the well the location was cleaned up, slush pits filled, and pits and firewall used in burning gas were constructed. This particular work was completed January 29, 1960. Spangler and his associates also negotiated for the construction of a pipeline to connect the well with a gathering system in the period between completion and the execution of the gas sales contract. Hickey assisted the lease owners in obtaining a right-of-way from the county for this purpose. Additionally, between completion time and institution of the lawsuit Spangler and Hickey negotiated with an adjoining lease owner in an effort to form a unit and increase the allowable of the well. While awaiting consummation of the sales contract mentioned Spangler retained an attorney for the purpose of securing a Federal Power Commission permit to produce gas from the well. The exact date does not appear, but sometime after June 23, 1960, and prior to institution of the suit the plaintiffs, Curtis Hickey and R. H. Lee, advised Spangler that the mineral lease had terminated by reason of non-production of minerals, and that he and his associate lessees owned no interest in the leasehold estate.

The motion for re-hearing of appellees, Spangler and his co-lessees, asserts that judgment of the trial court should be affirmed upon the undisputed facts, and supports that position by citing the very recent case of Skelly Oil Company v. Harris, Tex., 352 S.W.2d 950. The record will not sustain the appellees as the facts of this case clearly distinguishes it from the Harris case. In Harris a mineral lease dated October 21, 1943, for a primary term of ten years was assigned to Skelly Oil Company. Pursuant to pooling provisions the leased tract was pooled with other land October 5, 1953. On that same date operations were commenced for drilling a well on the pooled acreage. Actual drilling began October 17, 1953, and was continuously prosecuted until November 24, 1953. At the last mentioned date a gas well was completed and capped. The completed well was capable of producing gas and condensate in paying quanti-

ties. The lessee, Skelly Oil Company, thereafter requested and obtained a production allowable, arranged for a gathering system to run lines to the well, installed meters and meter stations, and negotiated a contract with a buyer for sale of the gas as produced from the well. Production from the well began January 4, 1954, forty-one days after completion, and continued without interruption. *Production began within the sixty days following completion.* The distinguishing facts of the two cases are apparent on reference to the facts of this case heretofore related. To summarize, in this case the well was commenced during the primary term which expired October 8, 1959, and was completed January 20, 1960. The well was shut in, thereafter the gas was flared and burned each week to prevent logging, negotiations entered into for sale of gas, right-of-way, system connections, Federal Power Commission permit, etc., *but no actual production of minerals,* as that term is used in the Hickey mineral lease, *was begun within sixty days after completion on January 20, 1960,* nor before August 1, 1960, the date Hickey and Lee filed suit.

 Because production or its absence, in relation to completion date differs as shown, the Harris case does not support the judgment of the trial court in this case. But Harris is directly in point and controls the construction of the language of the emphasized portion of paragraph 6 of the Hickey mineral lease heretofore quoted. Language in the Harris case mineral lease, identical with that in the lease here considered, was construed by the Supreme Court. That court held that the language of the clause, which it referred to as the "60 day clause", allowed the lessee a period of sixty days after completion of a well capable of producing to begin either actual or constructive production. The authority of the Harris case compels this court to hold that the Hickey lease terminated sixty days after January 20, 1960, unless the appellees established one or more of the defenses to its termination plead by them as defendants

in the trial court. The work done, such as flaring the well, sales contract and other negotiations, together with the other facts developed, do not constitute either drilling or re-working as those terms are used in the referenced clause of the Hickey lease.

The range of the defendants' pleading has been indicated. The trial judges submitted eighteen special issues to the jury, all of which were answered favorably to the defendants, appellees here. By answers the jury found that a well capable of producing gas in commercial quantities was completed January 20, 1960; that thereafter the lessees had been engaged in drilling and re-working operations on the lease with no cessation of more than sixty consecutive days from the date of completion; and that the lessees acted within a reasonable time to connect and produce the well before interruption by this suit. It is not practical to set out the rest of the jury findings, but among them were four answers finding Hickey represented to the original lessee as a positive fact that the Carthage Corporation had agreed to immediately take gas from the well upon its completion; that such representation was untrue; that the defendants, (lessees by assignment) relied upon such representation, and that such representation induced the defendants to make the agreement to drill the well.

Hickey and Lee's motion for new trial in the court below contained numerous assignments of error. The XI assignment is directed to the action of the trial court in overruling objections to submission of the series of issues raised by the alleged false representation of Curtis Hickey because the issues were immaterial and irrelevant and would not constitute a foundation for a judgment in the case. To understand this assignment it must be known that Spangler and the other appellees as defendants in their trial pleadings alleged that the representation attributed to Hickey was believed by them and induced them to delay the consummation of a gas sales contract until after

the well was completed, at which time or soon thereafter the falsity of the representation was discovered, and that by reason of the false representation and the defendants' reliance thereon Hickey and Lee are estopped to assert in this lawsuit the termination of the leasehold estate conveyed by the mineral lease. The defendants' prayer, so far as the false representation issues are concerned, is for relief by way of estoppel.

The appellees grouped their fourth, fifth and sixth points of error and brief them together. The fourth point is that the judgment rendered is not supported or authorized by the jury's verdict on the false representation series of issues, and that the trial court erred in submitting the series. The fifth point is that the series of issues is not supported by the pleadings and are immaterial and do not support the judgment rendered. The sixth point is that each issue in the series is without support in the evidence, and that the jury's verdict thereon is against the overwhelming weight and preponderance of the evidence.

■ The multifarious nature of the assignments of error in the motion for new trial in the trial court and the points of error briefed on appeal created a difficult task for the court below as well as here, to determine the distinct ground of error claimed by the appellant. However, it appears that the basic complaint is that estoppel in pais was plead by the defendants, but issues of actionable fraud were submitted to the jury by the trial court, and the jury's verdict on the fraud issues does not support the trial court judgment so far as it may rest upon the estoppel theory.

The elements of actionable fraud and estoppel in pais have much in common. See 22 Tex.Juris. (2) 668, Sec. 8 on the elements of estoppel in pais, and 25 Tex. Juris. (2) 625, Sec. 13 through 32 for a general summation of the elements of actionable fraud. The trial judge in submitting the defendants' issues on the estoppel theory might properly have submitted issues as to

Hickey making the representation alleged, its falsity, the defendants' reliance thereon, and in accordance with the allegations of the pleading, whether or not the representation induced defendants to delay as they did their effort to find a market for the gas and connect the well to a gathering line.

Instead of submitting this last issue mentioned the jury was asked to find whether or not Hickey's representation induced the lessees to enter into the mineral lease contract. Such an issue is foreign to the estoppel plead. The issue actually submitted is clearly an issue pertinent only in an actionable fraud series concerned with inducement to enter a contract. Generally, with some exceptions under circumstances not shown here, relief available for fraud inducing a contract is recision, reformation, cancellation or damages. See 26 T.J. (2) 17, Sections 78, 79 and 80, and the numerous cases listed in the footnotes there.

The plaintiffs neither plead nor sought relief from alleged fraudulent conduct on Hickey's part except by estoppel. Reformation sought in the defendants' pleading in this action is grounded upon mutual mistake and is not associated with the fraudulent representation issues. Apparently the issues of fraud were tried without pleadings.

As stated, the defendants sought the benefit of the law of estoppel. The first three issues of the series under discussion were pertinent to the theory of estoppel, but they were not necessarily referable to estoppel as they were referable also to the fourth in the series, an actionable fraud issue. Appellants' objection to the submission of the last issue in the fraud series should have been sustained by the trial court. The appellants' points of error in this regard are sustained, as well as their points that the jury's verdict on the entire series of issues do not support the judgment rendered.

■ A thorough examination of the record, the briefs of the parties, and the authorities cited satisfies this court that the jury's verdict upon the several defenses

submitted are against the overwhelming weight and preponderance of the evidence. A recitation of the evidence as it relates to each issue is impractical as such treatment would extend this opinion to an excessive length. Conclusions on the insufficiency of the evidence was expressed in the original opinion, and the evidence in support of the issues of mutual mistake discussed in detail. Although the original opinion is to be withdrawn and superseded, for, whatever it may be worth, the parties know the appraisal therein made of the facts.

The original opinion in this case dated March 20, 1962, is withdrawn, the appellees' motion for rehearing is overruled, the judgment of the trial court is reversed, and the case remanded for new trial.