**Vera Mae COX, et al., Appellants,**

v.

**Vernon T. STOWERS, dba Stowers Oil and Gas Co., and Bink, Inc., Appellees.**

**No. 07–89–0231–CV.**

Court of Appeals of Texas, Amarillo.

March 19, 1990.

Phil N. Vanderpool, Pampa, for appellants.

Waters, Holt, Fields & Waters, David E. Holt, Pampa, for David E. Holt. Culton, Morgan, Britain & White, L.A. White, Amarillo, for appellees.

Before DODSON, BOYD and POFF, JJ.

BOYD, Justice.

This case involves a question as to whether activities conducted by appellees Vernon T. Stowers d/b/a Stowers Oil and Gas Co., and Bink, Inc., were conducting

"reworking operations" sufficient to keep an oil and gas lease in force during its secondary term and while the only well, a gas well, was not in production.

From a trial court judgment that the lease continued in force, appellants Vera Mae Cox; Wilma Jeanne Gilmore; Carol Schmidt Woodward, trustee for the use and benefit of Brian Clayton Schmidt and Kelly Jerome Schmidt; Robert Martin Cobb; and Sallie Mae Grauer, bring this appeal. We affirm the judgment of the trial court.

In their seven points of asserted error, appellants attack the legal and factual sufficiency of the evidence to sustain the trial court judgment. That contention requires us to iterate the litany of rules governing the disposition of such challenges. In determining a legal insufficiency or "no evidence" point, we are required to consider only the evidence and inferences tending to support the finding of the trier of fact and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). In determining a factual insufficiency point, we must consider all the evidence and set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

The lease in question is dated January 1, 1947, and was executed by N. A. Cobb in favor of the Lenox Oil & Gas Co. It is for a primary term of ten years and as long thereafter "as oil, gas or other mineral is produced from said land under the lease." Appellants are the successors in interest to the original lessor and appellees are the successors in interest to the original lessee. It is undisputed that the only well on the lease was a gas well and, except for minimal amounts of production in January, April, and May, 1985, no gas was produced from the well from December 1984, until March or April of 1986.

The suit giving rise to this appeal was filed on October 24, 1986. In the suit, appellants sought termination of the lease, as relevant here, "because no oil, gas or other minerals were produced from the property between December, 1984, and April, 1985, and again between June, 1985, and March, 1986, and no drilling or reworking operations were conducted upon the property during the same periods of time."

Since the lease had been kept viable beyond its primary term by the production of gas, and the production of gas had ceased, the lease could only be continued in force by application of the "sixty-day clause." *Stanolind Oil & Gas Co. v. Newman Brothers Drill Co.*, 157 Tex. 489, 305 S.W.2d 169, 172 (1957). In relevant part, that clause provides:

> If after discovery of oil or gas the production thereof should cease from any cause, this lease shall not terminate if lessee commences additional drilling or reworking operations within sixty (60) days thereafter....

At the bench trial of this cause, other than cursory testimony as to attorney fees, only one witness testified. That witness was appellee Vernon T. Stowers. Stowers testified in December of 1984, there was no production from the well in question. At that time, he checked the well and discovered "this pressure on the line was building up and restricting flow." In January, 1985, he moved in a rig, "checked T. D., checked for fluid in the hole, and found that there was only about forty feet of fluid in the hole at that time, which was below the perforations." He concluded he needed to study what was wrong with the well. In February, 1985, he felt that the well was "domed" and consulted with some of his friends in engineering departments of various oil and gas companies. He injected the well with fifty barrels of treating fluid to try to remove the doming effect and shut the well in to allow the fluid "to dissipate and to do its work on the dome."

Stowers testified that he had thirty-five years experience in the oil field and had participated in the drilling and work-over of over two thousand wells. He went on to explain what he denominated as a "doming" effect in the Brown Dolomite formation (the productive formation in this field) and the result of that effect upon the pro-

ductivity of a well. He went on to detail his experience as a logging engineer in the Brown Dolomite formation and explained in some detail why he thought the course of treatment he was following was the correct one to cure the well problem.

In March, 1985, he again treated the well with fifty barrels of fluid and shut the well in "for the fluid to dissipate." In April, the well was showing a little pressure, and it was opened into the line "[t]o see if the doming effect had been cut through at that point." In April and May the well had minimal production. In June, the well was checked and, said Stowers, he was satisfied that the formation was sealed off. He ran a fluid travel log "to see where this fluid was going and how the formation was reacting to it." The well was treated with approximately fifty barrels of fluid and the well was shut in again "for this amount of fluid to dissipate." Based upon his experience, Stowers opined that during the period while the treatment fluid was dissipating into the formation, there would not be very much production.

In July, the well was checked but the fluid had not yet sufficiently dissipated, the fluid level was too high for the well to produce, and the well had to be shut in again for the fluid to dissipate. In August, Stowers checked the fluid, determined its level was "below the perfs", and connected a blower to the well to see if any production would be established. However, the blower "pulled a vacuum on the formation" which was not permissible in the field and had to be removed.

In September, the blower was brought back to the well and installed, but, again it pulled too much vacuum and had to be removed. In October, another fluid travel log was run, and the well was treated again with 50 barrels of fluid. In November, a wire line was run to check if the fluid had dissipated. It had not, and the well was shut in again to allow the fluid to dissipate. In December, the well was opened to the atmosphere and it was determined that there was no flow to the atmosphere from the well. Stowers felt that the treatment being used was not breaking through the doming effect, so he treated the well with a hundred barrels of fluid.

In January, 1986, the well was checked, the fluid was still standing over the top of the perforations, and production could not be had from the well. In February, Stowers found the well had some pressure. He ran a fluid level log and checked the condition of the casing. The fluid was found to be below the perforations. Because of that fact, Stowers concluded it would be necessary to have a blower or compressor adapted to the well that would not pull a vacuum on it. Accordingly, he went to LRS to install, design, or engineer a proper blower. In March a blower was installed and the well, according to Stowers, began to produce with production in April, 1986, amounting to $6,759.01.

Under examination by counsel for appellee Binks, Inc., Stowers opined that to produce gas from the lease effectively, even considering the possibility of drilling a replacement well, the well in question had to be salvaged. He also concluded that the well had been brought back into production by the treatment he had performed upon it and that there was nothing any operator could have done that would have restored production any sooner. Under cross-examination by counsel for appellants, Stowers admitted that qualified operators might disagree, but it remained his opinion that his method was the only treatment that would recover the well.

After the testimony as to attorney fees, Stowers was recalled by appellee Binks, Inc. In that testimony, Stowers reiterated that, other than the procedure he followed, he knew of nothing else that could have been done to restore production. He stated fluid treatments took a considerable time to work with the time varying from "treatment to treatment and from well to well." He further opined that the only way to determine whether the treatment was working was to let the well set and come back and check it at a later time.

Both parties agree that there is a paucity of cases defining the term "reworking operations" used in clauses such as the one in question. However, in *Phillips Pe-*

*troleum Co. v. Rudd,* 226 S.W.2d 464, 466 (Tex.Civ.App.—Texarkana 1949, no writ), the court implicitly, if not explicitly, approved a trial court jury instruction defining "reworking operations" as:

> You are instructed that after the Rudd–Hall well was completed and failed to produce on its original test, any and all efforts, acts, work or operations thereafter done in or on said well in a good faith effort to cause said well to produce oil or gas in paying qualtities (sic) are to be considered by you as reworking operations as that term is used in Special Issue No. 1.

In *Rogers v. Osborn,* 152 Tex. 540, 261 S.W.2d 311, 313–314 (1953), the court noted a somewhat similar trial court instruction which read as follows:

> You are instructed that the term 'reworking operations,' as used herein, means actual work or operations which have theretofore been done, being done over, and being done in good faith endeavor to cause a well to produce oil and gas or oil or gas in paying quantities as an ordinarily competent operator would do in the same or similar circumstances.

However, somewhat cryptically, in considering a jury finding that there had been both reworking and redrilling operations in the case, the court stated:

> We hold there is some evidence supporting this finding but do not pass upon the trial court's definition of the words 'drilling' and 'reworking'.

*Id.* 261 S.W.2d at 314.

We conclude that the term "reworking operations," as used in the instant clause, means any and all actual acts, work or operations in which an ordinarily competent operator, under the same or similar circumstances, would engage in a good faith effort to cause a well or wells to produce oil or gas in paying quantities. It is in the light of this definition that we determine this appeal.

■ In urging that reversal is required, appellants place primary reliance upon *Watson v. Rochmill,* 137 Tex. 565, 155 S.W.2d 783 (1941); *Hall v. McWilliams,* 404 S.W.2d 606 (Tex.Civ.App.—Austin 1966, writ ref'd n.r.e.); and *Hickey v. Spangler,* 358 S.W.2d 216 (Tex.Civ.App.—Texarkana 1962, writ ref'd n.r.e.). That reliance is misplaced as the cases are distinguishable.

In the *Watson* case, the operator had ceased production for two years and seven months because of "the demoralized condition of the oil market and the low gravity of the oil." 155 S.W.2d at 784. The court found that these conditions did not excuse and affirmed a trial court judgment terminating the lease because of the nonproduction after termination of the primary term. En route to that decision, the court took special note of the fact that those conditions "in no wise prevented the operation of the well by the lessee for whatever oil it would produce." *Id.* While appellants, citing testimony by Stowers that he initially "discovered that the line pressure had gone up, and the well was not able to continue to produce into the line at the same rate that it had due to sale problems," argue the facts of *Watson* are analogous to the instant ones, we disagree. In his testimony, Stowers went on to say the sales problem was Cabot's (the operator of the gathering lien) which caused them to leave the line full. That, he said, resulted in a situation where the line pressure equaled the well pressure effectively shutting the well off. The situations are not analogous since there is no testimony in this case that production ceased because of a unilateral decision of appellees. The question of "reworking operations" was not material in the *Watson* case.

In *Hall v. McWilliams, supra,* the trial court found an oil and gas lease had terminated because of cessation of production for a period in excess of sixty days during the secondary term of the lease. In that case, the well in question was pumping oil with a large amount of salt water. That salt water was moved to an adjoining lease and pumped into an injection well. The Railroad Commission suspended the permit for the injection well leaving the lessee with a producing well but with accompanying salt water to be disposed of in some manner. No oil was produced from the

well during the months of October, November, and December. However, during that time a pumper continued to service the lease each week by starting the motor on the well and pumping it for about five minutes or long enough to pass fluid by the pump to keep it from sticking. Under that testimony, the court held that the evidence was undisputed that there was no production from the lease and no drilling or reworking operations on the lease for more than sixty days. Therefore, it concluded, the trial court was justified in its finding that the lease had terminated.

In *Hickey v. Spangler, supra,* a well was begun within the primary term of the lease and completed 105 days after the expiration of that term. The well was shut in at completion with a switcher opening the well controls at least once each week to allow the gas to blow and be burned. This procedure was thought necessary to keep the well from logging up and being killed by salt water or other liquid. However, the lessees, commencing the week of completion, continuously negotiated for a gas sales contract with various companies which culminated in the execution of a contract with the Tennessee Gas Transmission Company some six months after the completion of the well. During that period the lessees had also engaged in various other negotiations with adjoining land owners in an effort to form a unit to increase the allowable of the well. They had also negotiated for the construction of a pipeline to connect the well to a gathering system and for a Federal Power Commission permit to produce gas from the well. The appellate court held that the evidence established that a well was completed but no actual production of minerals was begun within the requisite sixty day period. That being the case, the court held the lease terminated since the well flaring and contract negotiations did not constitute either drilling or reworking as those terms were used in the lease.

In neither of the last two cases was there any testimony similar to that of Stowers in this case. We have made extensive reference to that testimony above. However, summarized, that testimony was that the well had ceased to produce in December, 1984 and that the fluid treatment process followed by him, based upon his considerable experience, was the correct method in treating and restoring the well to production. He also testified that the waiting periods and procedures followed by him were necessary in the course of that treatment.

Stowers' uncontroverted testimony was sufficient to justify the trial court's findings that his treatment and activities were sufficient to constitute good faith reworking activities commenced within sixty days from the cessation of production and continuing until restoration of substantial production from the well in April, 1986. The trial court was, therefore, justified in entering the judgment giving rise to this appeal.

Accordingly, all of appellants' points of error are overruled and the judgment of the trial court is affirmed.