

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-15-00303-CV
_____

HARDIN-SIMMONS UNIVERSITY, WEST TEXAS REHABILITATION CENTER,
CYRUS S. FROST, CHRISTOPHER FROST WHIDDON, NANCY SEABERRY FROST
ARTS ENDOWMENT, BULLOCK MANAGEMENT PARTNERSHIP, LTD., JAMES S.
FROST, INDIVIDUALLY AND AS INDEPENDENT EXECUTOR OF THE ESTATE OF
MARY LOU FROST PERKINS, DECEASED, CAROLYN FROST HIZA, JULIE FROST
COCHRAN, LYNN ETHERIDGE MORRIS, GAIL ETHERIDGE BRAY, BEVIN SPRING
ETHERIDGE, ALLEN LESLIE, AND ELENE D. WILSON, TRUSTEE OF THE RALPH
W. AND ELENE D. WILSON REVOCABLE TRUST, APPELLANTS

V.

HUNT CIMARRON LIMITED PARTNERSHIP D/B/A
CIMARRON EXPLORATION COMPANY, APPELLEE

On Appeal from the 286th District Court
Cochran County, Texas
Trial Court No. 12-04-4268; Honorable Pat Phelan, Presiding

July 25, 2017

## MEMORANDUM OPINION

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.[1]

_____

[1] Justice Mackey K. Hancock, retired, not participating.

By this appeal, we are asked to construe certain provisions of an oil and gas lease in order to determine whether, and to what extent, it remained in effect after expiration of its primary term due to a lack of production in paying quantities. Appellants, Hardin-Simmons University, West Texas Rehabilitation Center, Cyrus S. Frost, Christopher Frost Whiddon, Nancy Seaberry Frost Arts Endowment, Bullock Management Partnership, Ltd., James S. Frost, Individually and as Independent Executor of the Estate of Mary Lou Frost Perkins, Deceased, Carolyn Frost Hiza, Julie Frost Cochran, Lynn Etheridge Morris, Gail Etheridge Bray, Bevin Spring Etheridge, Allen Leslie, and Elene D. Wilson, Trustee of the Ralph W. and Elene D. Wilson Revocable Trust (collectively "Hardin-Simmons") are the lessors, or successors-in-interest to a lessor, in an oil and gas lease (the "subject lease") covering seven and three-quarter sections of land (approximately 4,960 acres) in Cochran County, Texas. Appellee, Hunt Cimarron Limited Partnership, d/b/a Cimarron Exploration Company, is the lessee. Hardin-Simmons sued Hunt for (1) breach of the express covenant to explore and develop the leased premises for oil and gas and (2) breach of the implied covenant to (a) drill initial wells, (b) develop the premises, (c) protect the premises from drainage, and/or (d) market the oil or gas produced. Hardin-Simmons also sought a declaratory judgment concerning Hunt's failure to file a written release describing the mineral interests no longer held by production.

The claims being asserted by Hardin-Simmons were presented to a Cochran County jury in April of 2015. Upon return of a verdict in favor of Hunt, the trial court entered a take-nothing judgment as to those claims. By four issues, Hardin-Simmons asserts the trial court erred in (1) denying its motion for judgment because, as a matter

2

of law, the subject lease expired at the end of the primary term as to all non-productive acreage, (2) denying its motion for new trial because the jury's failure to find that Hunt breached certain lease covenants is against the great weight and preponderance of the evidence, (3) denying its motion for new trial because the jury's failure to find that Hunt breached the subject lease by not executing a release was against the great weight and preponderance of the evidence, and (4) denying its motion for new trial because the jury's finding that certain wells at issue were producing in paying quantities was against the great weight and preponderance of the evidence. We reverse the judgment of the trial court and render judgment declaring the subject lease has terminated, in part; and, we remand the cause to the trial court for further proceedings consistent with this opinion.

BACKGROUND

As stated above, the Hardin-Simmons parties are the lessors, or successors-in-interest to a lessor, in the subject lease, executed August 1, 2006, covering approximately 4,960 acres in Cochran County, Texas (the "Frost property"). In the late 1950s, several producing wells were drilled on the Frost property in the San Andres formation; however, production had significantly dropped-off by the mid-1960s. In 1967, the Buckshot Unit was created and operated as a "waterflood" project.[2] The Buckshot Unit consisted of approximately 13,000 acres comprised of the Frost property and adjacent property to both the east and west. In the late 1990s, the original operator of the lease on the Frost property, Santa Fe Exploration, ceased production altogether and

_____

[2] A "waterflood" is a method of secondary recovery in which water is injected into the reservoir formation through an "injection well" in order to displace residual oil. The water from the injection wells physically sweeps the displaced oil to adjacent production wells. *See Schlumberger Oilfield Glossary,* http://www.glossary.oilfield.slb.com/Terms/w/waterflood.aspx (last visited July 20, 2017).

3

the Frost property fell out of the Buckshot Unit. The owners of the Frost property then entered into a new lease with Moriah Energy Corporation which was later assigned to United Oil and Gas. After United's primary term expired, it released most of the original acreage, leaving approximately 700 acres under that lease. Eventually, Hunt became the sole owner of United's remaining interest. At the time, Hunt also held the leases on the adjacent properties that previously comprised the Buckshot Unit.

Hunt then entered into negotiations for a new lease covering the entire Frost property (including the acreage already held by production). Following those negotiations, the necessary parties executed the subject lease on August 1, 2006. The lease provided for a primary term of five years, ending on July 31, 2011, and it was vertically limited from the surface to 100 feet below the base of the San Andres oil and gas formation. The new lease also contained a "Pugh clause"[3] and a "retained acreage clause"[4] such that, unless otherwise provided, at the end of the primary term, the lease expired as to non-productive acreage. The Pugh clause, found at paragraph 12.a., provided as follows:

---

[3] A "Pugh clause," sometimes known as a "Freestone Rider," is a covenant in an oil and gas lease created "to protect the lessor from the anomaly of having the entire property held under a lease by production from a very small portion." *Sandefer Oil & Gas, Inc. v. Duhon,* 961 F.2d 1207, 1209 (5th Cir. 1992) (discussing the origin and purpose of a Pugh clause). A Pugh clause operates to sever producing lands or strata from non-producing property according to some defined criteria and it places additional burdens on the lessee to take certain steps in order to maintain the lease beyond the primary term as to the non-producing property. *Id.* Pugh clauses are thus designed to benefit the lessor by encouraging diligent development of the leased premises and discouraging the idle retention of undeveloped lands. *Id.* While all Pugh clauses share the same basic purpose, they may differ in the requirements imposed on the lessee in order to continue the lease beyond its primary term. *Id.* at 1210.

[4] A "retained acreage clause" is a covenant that excludes certain acreage from the automatic termination and reversion provisions contained in an oil and gas lease. *See XOG Operating, LLC v. Chesapeake Expl. L.P.*, 480 S.W.3d 22, 28 (Tex. App.—Amarillo 2015, pet. ref'd). Retained acreage clauses typically provide that at the end of the primary term, each producing well will hold a specified number of acres, with all other (non-producing) acreage being released. *Sutton v. SM Energy Co.,* 421 S.W.3d 153, 159 (Tex. App.—San Antonio 2013, no pet.).

12.a. At the end of the primary term and subject to the other terms hereof, this lease shall continue as to, and only as to, land included in a "production unit", as said term is hereinafter defined in paragraph 12.b. This lease shall terminate as to all other acreage. Lessee shall have the option, but not the obligation to continue this lease in force as to all acreage covered hereby by commencing a well within 150 days prior to the end of said primary term and drilling and completing said well in a workmanlike manner to a depth sufficient to penetrate and test the San Andres formation. Thereafter, Lessee shall have the option of maintaining this lease in effect as to all acreage then covered by the commencement of drilling operations on successive wells each of which shall be commenced within 150 days after the completion of the prior well. Such drilling shall constitute a "continuous development program" by which Lessee may keep this lease in force and effect as to all lands and depths then covered hereby and thereby postpone the partial termination date provided below in paragraph 12.b. until the expiration of 150 days after the completion of a well without there being the commencement of another well. Upon the expiration of such time without the commencement of another well, there shall be a "cessation of the continuous development program" at which time the provisions of paragraph 12.b. shall become operative.

This clause gave Hunt the right to maintain the entire lease by engaging in a "continuous development program" prior to the end of the primary term.

The retained acreage clause, found at paragraph 12.b., provided as follows:

12.b. At the later of the end of the primary term or the cessation of the continuous development program for which provision is above made (herein called the "partial termination date") this lease shall terminate as to all lands and depths covered hereby, save and except as to the acreage and depths included in a production unit which said unit is defined as being: (i) a Unitized Tract formed under the Unitization Statute (which Unitized Tract shall be subject to the Agreement as referenced and described above in paragraph 5); (ii) 40 acres around each producing oil well which is not in a Unitized Tract; (iii) 40 acres around each well from which make-up water for secondary recovery operations is being taken for use on a Unitized Tract; (iv) 40 acres around any disposal well used for the disposal of water from, and only from, the land covered by this lease; (v) 80 acres around each producing or shut-in gas well.

As to any acreage which is not included in a Unitized Tract, this lease shall continue down to and not below the shallower of the total depth covered by this lease or 100 feet below the deepest depth theretofore

5

drilled on the respective production units. The area of production units is subject to adjustment as provided in paragraph 12.c. hereof.

After the partial termination date, the acreage and depths assigned to each production unit, including that within a Unitized Tract, shall be deemed to be covered by a separate lease containing the terms and: provisions hereof as to, and only as to, the acreage and depths of that unit, to the end that thereafter there shall be a separate lease as to each production unit that can be kept in force and effect only by actual or constructive production from, or operations upon, that particular production unit without regard to production or operations upon the other production units retained under the terms hereof.

As an appurtenance to the land which remains covered by this lease after the partial termination date, Lessee shall continue to have necessary rights and easements for the purposes hereof in, on and across the acreage as to which this Lease has terminated. Such rights shall include the right to use any injection well or a well from which make-up water is obtained for so long as such wells are used for said purpose. Lessee shall designate of record the production units for which provision is herein made. Such designation shall be made in regular rectangular tracts as fractions of quarter sections so as not to impede the future development for oil and gas. The acreage allocated to each production unit in accordance with the terms of this paragraph shall be described in a written designation and partial release executed by Lessee and recorded in the official real property records of Cochran County, Texas a copy of each such filing, as recorded, shall be furnished to Lessor within 30 days after the partial termination date. If such designation is not received by Lessor within 30 days after Lessor has given Lessee notice of Lessee's failure to file and furnish the designation and partial release, Lessor may file an affidavit designating production units for existing producing wells defining the acreages and depths as to which the lease continues to be operative and that as to which it has terminated. Acreage which is then in a Unitized Tract previously shown of record in Cochran County, Texas may be designated by reference to such previously recorded document.

This clause gave Hunt the right to maintain the lease as to certain acreage and depths included in a "production unit," as defined therein, by exempting that acreage from the automatic termination provisions of paragraph 12.b.

6

Relevant to the dispute in this case, the lease further provided a means of avoiding partial termination through a "reworking clause" contained in paragraph 6. The reworking clause provided, in part, as follows:

> [i]f at the expiration of the primary term, oil or gas is not being produced from the land and depths subject to this lease but Lessee is then engaged in . . . the reworking of any well on said land, this lease shall remain in force in accordance with its terms so long as . . . reworking operations are prosecuted (whether on the same or different wells) with no cessation of more than one hundred twenty (120) consecutive days . . . .

Similar to the "continuous development clause," this clause permitted Hunt to maintain the lease, "in accordance with its terms," past the primary term by engaging in "reworking operations" prior to that date. Construction of this clause is at issue in this case.

Finally, the subject lease provided that Hunt was required to file a written document releasing all non-productive acreage within thirty days following the end of the primary term. Specifically, paragraph 12.h. provided as follows:

> [u]pon the partial or total termination of this lease, either as to depth or area, the Lessee shall within thirty (30) days after any such termination file a written release in the public records of the county in which the land is located describing the area or depth no longer subject to this lease. A copy thereof shall be furnished to Lessor.

Accordingly, absent a savings provision such as the "continuous development clause" or the "reworking clause," the lease required Hunt to file a written document releasing all non-productive acreage within thirty days following the end of the primary term.

7

At the same time they executed the subject lease, the parties entered into a side agreement regarding unitization, the purpose of which was to facilitate the reconstitution of the Buckshot Unit. Despite this side agreement, Hunt did not file a unitization application with the Texas Railroad Commission during the primary term of the lease.

Evidence presented at trial showed that, during the primary term of the subject lease, Hunt did not commence drilling on any new wells,[5] convert any of the legacy wells (wells that were in existence prior to execution of the subject lease) into injection wells, nor recomplete any of those legacy wells in a new production zone. Evidence further showed that, in July 2011, shortly before the end of the primary term, Hunt did commence reworking operations on ten legacy wells.

On October 21, 2011, Hunt received a letter from counsel for Hardin-Simmons stating that the lease had terminated due to non-production. In that letter, Hardin-Simmons's counsel enclosed a *Release of Oil and Gas Lease* form that covered the entire acreage as to both horizontal area and vertical depth, and he requested that Hunt execute and return that release no later than November 14, 2011.

Hunt did not sign the release and instead claimed that the entire lease remained in effect pursuant to the "reworking clause" found in paragraph 6. Hunt reasoned that because it had commenced reworking operations prior to the expiration of the primary term and there had never been a period of more than 120 days when they were not engaged in those reworking operations, the lease remained in full force and effect as to all acreage and all depths. In its response to Hardin-Simmons's request, Hunt noted

---

[5] Prior to the execution of the lease, during the period covered by the Moriah lease, Hunt did drill twelve wells on the Frost property.

8

that "considerable effort and resources towards" re-unitization had already been committed, that it was "engaged in a continuing program of reworking wells and returning abandoned wells to production" and that "the Frost lease [had been] fully maintained under the terms of paragraph 6 of our lease." Unsatisfied with Hunt's position, Hardin-Simmons filed suit in April 2012 and the case was tried before a jury in April 2015. Contrary to Hunt's position, Hardin-Simmons maintained that, as a matter of law, the lease expired at the end of the primary term as to all non-productive acreage.

As relevant to this appeal, the jury answered the following questions:

Question No. 1

Did [Hunt] fail to drill additional wells on the lease that a reasonably prudent operator would have drilled?

Answer: No

\* \* \*

Question No. 3

Did [Hunt] fail to execute a written release describing the areas or depths no longer subject to the lease?

\* \* \*

Answer: No

Question No. 5

Were the following wells producing in paying quantities on August 1, 2011?

| Well 107 | Yes |
|----------|-----|
| Well 109 | Yes |
| Well 147 | Yes |
| Well 266 | Yes |
| Well 285 | Yes |
| Well 287 | Yes |
| Well 343 | Yes |

9

| | |
|---|---|
| Well 349 | <u>Yes</u> |
| Well 383 | <u>Yes</u> |
| Well 385 | <u>Yes</u> |

The court's charge did not define the term "in paying quantities."

Following the jury's verdict, the trial court requested both parties to file a motion for entry of judgment. Hardin-Simmons's motion requested the trial court to disregard the jury's answer to Question Number 3 (pertaining to the execution of a written release) and it also challenged the jury's answers to Question Number 5 (pertaining to the question of whether ten specific wells were producing in paying quantities at the end of the primary term). Hardin-Simmons's motion requested the trial court enter a judgment describing that portion of the mineral estate (both horizontal acreage and vertical depth) held by the subject lease, as well as any portion no longer held by that lease. Hardin-Simmons also requested that the trial court require Hunt to execute a release as to any non-productive acreage in accordance with the terms and provisions of the subject lease. Hunt's motion simply recited that the jury's answers were supported by competent evidence. On May 8, 2015, following a hearing on the respective motions of the parties, the trial court entered its *Final Judgment* providing that Hardin-Simmons "take nothing" from Hunt.

APPLICABLE STANDARD OF REVIEW

According to Hardin-Simmons, our construction of the lease agreement is determinative of the disposition of this case. Specifically, we construe Hardin-Simmons's first issue as turning on two disputes, both of which concern the intent of the parties: (1) whether the "reworking clause" applied to legacy wells, and, if so, (2)

10

whether it exempted from termination the entire lease or only that acreage included in a "production unit." While Hardin-Simmons does not succinctly set-out the applicable standard of review to be applied, we construe issue one as a legal sufficiency challenge—asserting the trial court erred, as a matter of law, by failing to declare the subject lease expired at the end of the primary term as to all non-productive acreage. Furthermore, we construe issues two, three, and four as factual sufficiency challenges pertaining to the jury's answer to Question Number 1 (lessor's duty to adequately develop the leased property), Question Number 3 (lessor's duty to execute a release as to non-productive properties), and Question Number 5 (whether certain wells were producing in paying quantities).

In reviewing a legal sufficiency issue, we may sustain the challenge only when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence, or (d) the evidence conclusively establishes the opposite of the vital fact in question. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030, 124 S. Ct. 2097, 158 L. Ed. 2d 711 (2004). In determining whether there is legally sufficient evidence to support the finding under review, a reviewing court must view the evidence in a light most favorable to the judgment, indulging every reasonable inference that supports it, but the court may not disregard evidence that allows only one inference. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex. 2005). The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.

*Id.* at 827. As applied to the facts of this case, Hardin-Simmons contends that, under a proper construction of the subject lease, the evidence establishes, as a matter of law, the absence of any facts that would extend the primary term of that lease, as to any non-productive acreage.

An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965). Where a party with the burden of proof at trial challenges the factual sufficiency of the evidence to support the trial court's judgment, that party must demonstrate that the verdict is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). In reviewing factual sufficiency, the reviewing court must consider, examine, and weigh all of the evidence in the record. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406-07 (Tex. 1998), *cert. denied,* 525 U.S. 1017, 119 S. Ct. 541, 142 L. Ed. 2d 450 (1998). In doing so, the court no longer considers the evidence in the light most favorable to the finding; instead, the court considers and weighs all the evidence, and sets aside the disputed finding only if it is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.* at 407.

APPLICABLE LAW—LEASE CONSTRUCTION

An oil and gas lease is a contract conveying an interest in real property. *Petro Pro, Ltd. v. Upland Res., Inc.,* 279 S.W.3d 743, 750 (Tex. App.—Amarillo 2007, pet. denied) (citing *Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 525 (Tex. 1982)). As such, an oil and gas lease must be construed and interpreted in accordance with the

12

same rules of construction as any other contract. *See Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005); *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002). The construction of a contractual agreement is a question of law which we review *de novo. BP Am. Prod. Co. v. Red Deer Res., LLC*, __ S.W.3d __, No. 15-0569, 2017 Tex. LEXIS 410, at *7 (Tex. April 28, 2017). In construing an unambiguous oil and gas lease, such as the one at issue here, the court's primary duty is to ascertain and give effect to the intent of the parties as expressed within the four corners of the lease. *Id.*; *XOG Operating, LLC v. Chesapeake Expl. L.P.,* 480 S.W.3d 22, 26 (Tex. App.—Amarillo 2015, pet. denied). In determining the intent of the parties, we consider the entire agreement, attempting to harmonize all of its parts, even if different parts appear contradictory or inconsistent and we presume that the parties intended every clause to have some effect. *Red Deer Res.,* 2017 Tex. LEXIS 410, at *7. In doing so we give the language used its plain meaning, unless doing so would clearly defeat the intent of the parties. *Id.*

### APPLICABLE LAW—LEASE TERMINATION

In Texas, a typical oil and gas lease grants a fee simple determinable estate, thereby establishing in the grantor a possibility of reverter, with the determinable condition typically being the absence of oil or gas production. *BP Am. Prod. v. Laddex, Ltd.*, 513 S.W.3d 476, 481 (Tex. 2017); *Anadarko Petroleum Corp.*, 94 S.W.3d at 554 (citing *Texas Co. v. Davis*, 113 Tex. 321, 254 S.W. 304, 309 (Tex. 1923)). As such, the mineral estate continues indefinitely, as long as the lessee uses the property for its intended purpose according to the determinable condition. *Red Deer Res.*, 2017 Tex. LEXIS 410, at *8 (citing *Anadarko Petroleum Corp.*, 94 S.W.3d at 554). If the

13

determinable condition occurs, an automatic termination of the mineral estate takes place in accordance with the agreement of the parties. *Id.* Whether a determinable condition has occurred and the lease has terminated under a given set of conditions "is always a question of resolving the intention of the parties from the entire instrument." *Id.*

The habendum clause of an oil and gas lease defines the duration of the mineral estate. *Id.* A typical habendum clause provides that the lease will remain in force for a short fixed term of years (the primary term) and "as long thereafter as oil, gas or other minerals is produced" (the secondary term). *Id.* The word "produced," as used in the typical habendum clause, means "actual production in paying quantities." *Anadarko Petroleum Corp.*, 94 S.W.3d at 554. As such, the word "produce" is "synonymous with the phrase 'producing in paying quantities.'" *Red Deer Res.*, 2017 Tex. LEXIS 410, at *8 (quoting *Hydrocarbon Mgmt., Inc. v. Tracker Expl., Inc.*, 861 S.W.2d 427, 432 n.4 (Tex. App.—Amarillo 1993, no writ)). "'Production in paying quantities' means 'the production is sufficient to pay the lessee a profit, even small, over the operating and marketing expenses, although the cost of drilling the well may never be repaid.'" *Id.* Whether a marginally productive well has ceased to "produce in paying quantities" is a question of fact for the jury, and the burden is on the lessor to prove a lack of such production in order to terminate the lease. *Laddex, Ltd.*, 513 S.W.3d at 482. To assist courts in answering this question, the Texas Supreme Court has spelled out a two-pronged analysis, holding that whether a well has ceased to produce in paying quantities depends on (1) whether the well shows a profit, even small, over operating expenses, and (2) if not, whether, under all the relevant circumstances a reasonably

14

prudent operator would, for purpose of making a profit and not merely for speculation, continue to operate that well as it has been operated. *Id.* at 482-83.

In any "production-in-paying-quantities" analysis, the profitability of a given well must be measured over a reasonable period of time according to the facts and circumstances surrounding that particular well. *Id.* (citing *Clifton v. Koontz*, 325 S.W.2d 684, 690 (Tex. 1959)) (stating that, unless the lease agreement defines the period for which production in paying quantities is measured, "there can be no limit as to time, whether it be days, weeks, or months, to be taken into consideration in determining the question of whether paying production from the lease has ceased"). Furthermore, in conducting this analysis, we review the surrounding circumstances according to a presumption that the well must be capable of producing in paying quantities without additional equipment or repairs. *Anadarko Petroleum Corp.*, 94 S.W.3d at 558.

Although a habendum clause generally controls the lease's duration, other clauses may extend the term of the lease. *Id.* at 554. The category of clauses that might extend the duration of an oil and gas lease beyond a determinable condition, generally known as "savings clauses," include, among others, the "drilling operations clause," "continuous operations clause," or "reworking clause." *Hydrocarbon Mgmt.*, 861 S.W.2d at 432 n.4. Under this type of clause, even in the absence of production in paying quantities, a lease remains in effect during the secondary term if the lessee conducts certain specified operations within a fixed number of days of a given condition. *Samano v. Sun Oil Co.*, 621 S.W.2d 580, 580-81 (Tex. 1981) (finding an oil and gas lease terminated because the lessors failed to produce, drill, or re-work their operations within the specified time period).

In a typical reworking clause, reworking operations include "any and all actual acts, work or operations in which an ordinarily competent operator, under the same or similar circumstances, would engage in a good faith effort to cause a well or wells to produce oil or gas in paying quantities." *Cox v. Stowers*, 786 S.W.2d 102, 105 (Tex. App.—Amarillo 1990, no writ). As such, "operations" necessary to maintain a lease include "activities that [are] calculated to obtain production." *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 160 (Tex. 2004).

ANALYSIS

Hardin-Simmons contends that, under a proper construction of the lease, the evidence establishes, as a matter of law, the absence of any facts that would extend the term of the lease beyond the primary term, as to any non-productive acreage. Specifically, it contends undisputed facts establish the absence of any production as to the entire acreage, including all zones, save and except the acreage and depths included in a "production unit" as defined by paragraph 12.a. of the lease. Therefore, according to its construction, the lease terminated at the end of the primary term on July 31, 2011, as to the non-producing acreage. Taking a contrary position, Hunt contends the lease remained in full force and effect as to the entire acreage because the term of the lease was extended by the "reworking clause" contained in paragraph 6.

Here, the habendum clause contained in paragraph 2 of the lease provided, "[s]ubject to other provisions herein contained, this lease shall remain in force for a term of five (5) years from this date (called the "primary term"), and as long thereafter as oil or gas, either or both, is produced from said land." Therefore, because it was undisputed that the lease provided for a primary term of five years, ending on July 31,

2011, the lease would have terminated, as a matter of law, on that date, unless "other provisions herein contained" provided otherwise. While both parties agree the "reworking clause" contained in paragraph 6 is a provision "providing otherwise," they disagree concerning both the construction of that paragraph and whether the facts of this case fall within its provisions.

First, Hardin-Simmons contends that none of the factual preconditions set forth in paragraph 6 exist. Those preconditions include the drilling and abandonment of a dry hole prior to the discovery of oil or gas or the cessation of production at some time thereafter. Hardin-Simmons reasons that because Hunt did not drill any new wells pursuant to the subject lease agreement, there are no wells which it could "rework." This argument finds little support in the record because (1) the lease agreement does not specify that legacy wells are excluded from the potential inventory of wells to be reworked and (2) testimony established that prior to July 31, 2011, producing wells had been drilled on the leased property and Hunt was engaged in reworking operations, as to those particular wells, prior to the expiration of the primary term of the lease. Therefore, Hardin-Simmons's argument fails as to the non-applicability of the reworking clause found in paragraph 6.

Secondly, and more critically, Hardin-Simmons contends that, even if paragraph 6 did apply, it did not extend the *primary term* of the lease—but, instead, only extended the *overall term* of the lease as it pertained to "producing acreage" relevant to the well being reworked. It contends that because paragraph 6 merely provides that, in the event of reworking operations, "this lease shall remain in force in accordance with its

17

terms," then the continuation of the lease was still controlled by "its terms"—specifically including the Pugh clause and retained acreage clause. We agree.

Hunt's argument that the entire lease was extended by operations in accordance with the reworking clause is undermined by a comparison of the provisions of the reworking clause with the provisions of the continuous development and retained acreage clauses. While both the reworking and continuous development clauses would have the effect of continuing the term of the lease, notwithstanding the absence of production, there are significant differences between the two. First, the reworking clause provides that in the event of reworking operations "this lease shall remain in force *in accordance with its term*s so long as . . . reworking operations are prosecuted . . . ." (Emphasis added).

By way of contrast, the continuous development clause specifically provides that, in the event of a continuous development program, the lease will be kept "in force and effect *as to all lands and all depths*" covered by the lease agreement. The language "as to all lands and all depths" is, therefore, significantly different from the provisions of the reworking clause. Furthermore, "in accordance with its terms" specifically incorporates the terms of the lease agreement—including the Pugh clause and retained acreage clause. The retained acreage clause, found in paragraph 12.b., defined the "partial termination date" as the "end of the primary term or the cessation of the continuous development program,*"* not the "reworking program," indicating differential treatment of the two savings provisions. Therefore, according to the express terms of the Pugh clause and retained acreage clause, at the end of the primary term, the lease continued

only as to acreage included within a defined "production unit," including wells being reworked.

The retained acreage clause found at paragraph 12.b. of the lease agreement defined the acreage exempted from automatic termination by specifying five categories of acreage: (1) unitized tracts, (2) producing oil wells, (3) "make-up" water wells, (4) disposal wells, and (5) gas wells. The record established that no acreage had been unitized or otherwise assigned to a waterflood plan and that none of the wells were classified as gas wells. The record further established that there were 35 producing wells and three disposal wells.[6] Based on this record, Hardin Simmons contends Hunt only retained 40 acres around each oil well that was producing in paying quantities and each water disposal well that was active as of the end of the primary term. Because Hardin-Simmons met its burden of showing the occurrence of the determinable condition, *i.e.*, the absence of production as to all other acreage; and, Hunt failed to meet its burden of establishing the application of a savings provision obviating the application of the termination provisions of paragraph 12.a. as to those acres, the subject lease expired, as a matter of law, at the end of the primary term as to those non-productive acres. Accordingly, Hardin Simmons's first issue is sustained.

ISSUE TWO

By its second issue, Hardin-Simmons presents a factual sufficiency issue contending the trial court erred by denying its motion for new trial because the jury's finding that Hunt did not breach an implied covenant to reasonably develop the Frost

_____

[6] Those wells were designated as: 107, 109, 147, 169, 209, 226A, 247, 248W, 249, 265, 266, 267, 285, 287, 303, 304, 305, 306, 307, 308, 309, 323, 324, 325, 326W, 328W, 343, 348, 349, 363, 367, 369, 382, 383, 385, 388, 404, and 408. The location of each well was depicted on PX-51.

19

property was against the great weight and preponderance of the evidence. We disagree.

Texas courts have recognized an implied covenant to reasonably develop and protect the leased premises once production has been obtained. *Amoco Production Co. v. Alexander,* 622 S.W.2d 563, 567 (Tex. 1981); *Grayson v. Crescendo Resources,* 104 S.W.3d 736, 739 (Tex. App.—Amarillo 2003, pet. denied). A lessee's duty under this covenant is to act as a reasonably prudent operator under the same or similar circumstances. *Amoco Production Co.,* 622 S.W.2d at 567-68. The covenant to develop is only implicated after production is secured and requires the lessee to act with reasonable diligence so that the operations result in a profit to both lessor and lessee. *Koontz,* 325 S.W.2d at 693.

Here, the question regarding reasonable development was presented to the jury in the form of Question Number 1, which provided as follows:

> Did [Hunt] fail to drill additional wells on the lease that a reasonably prudent operator would have drilled?

The question was accompanied by the following instruction:

> You are instructed that [Hunt] has a duty to drill all wells that a reasonable and prudent operator would drill under the same or similar circumstances, with a reasonable expectation of profit. This duty to drill extends from the surface to the base of the San Andres Formation.

The jury unanimously answered the question: "No."

20

Hardin-Simmons contends that evidence supporting a finding of breach of the implied covenant was provided by Hunt's own engineering reports. Whether that argument is correct is of little moment given the jury's answer to Question Number 1 and the appropriate standard by which we must review that finding. Hunt contends, and we agree, the record contains substantial evidence that it was in the process of developing the full 4,960 acres as a waterflood unit. The evidence of production and development is sufficient to defeat any contention that the jury's answer to Question Number 1 is against the great weight and preponderance of the evidence. Issue two is overruled.

ISSUE THREE

Hardin-Simmons's third issue contends the jury's finding that Hunt did not fail to execute a written release describing the areas or depths no longer subject to the lease is also against the great weight and preponderance of the evidence. Based on our discussion of its first issue, we agree. Accordingly, we hereby sustain issue three, set aside the jury's answer to Question Number 3, and render a finding that Hunt failed to execute a written release describing the areas or depths no longer held by the subject lease.

ISSUE FOUR

By its fourth and final issue, Hardin-Simmons contends the jury's finding that ten particular wells were producing in paying quantities was also against the great weight and preponderance of the evidence. Discussing each well seriatim, Hardin-Simmons contends Hunt failed to present evidence of any revenue from those wells and,

therefore, the jury had no factual basis upon which it could determine those wells were producing in paying quantities.

As stated above, whether a well is producing in paying quantities is a question of fact for the jury, and the burden is on the lessor to prove a lack of production in order to terminate the lease. *Laddex, Ltd.*, 513 S.W.3d at 482. Here, Hardin-Simmons did not offer any evidence that the particular wells were not profitable over a reasonable period of time. Instead, it argues that Hunt's evidence established that each well was not operational at the end of the primary term. That argument begs the question. It does not matter whether an individual well was actually operational on the last day of the primary term; what is critical is whether the well can be considered as profitable over a reasonable period of time according to the facts and circumstances surrounding that particular well. *Id.* at 482 (citing *Koontz*, 325 S.W.2d at 690) (stating that, unless the lease agreement defines the period for which production in paying quantities is measured, "there can be no limit as to time, whether it be days, weeks, or months, to be taken into consideration in determining the question of whether paying production from the lease has ceased"). Because Hardin-Simmons failed to meet its burden of showing that the jury's finding was against the great weight and preponderance of the evidence, its fourth issue is overruled.

CONCLUSION

The trial court's take-nothing judgment in favor of Hunt Cimarron Limited Partnership d/b/a Cimarron Exploration Company is reversed and judgment is hereby rendered declaring the subject lease to have terminated as to the entire acreage, save and except a 40-acre tract associated with each of the following wells: the 107, 109,

147, 169, 209, 226A, 247, 248W, 249, 265, 266, 267, 285, 287, 303, 304, 305, 306, 307, 308, 309, 323, 324, 325, 326W, 328W, 343, 348, 349, 363, 367, 369, 382, 383, 385, 388, 404, and 408. Because the trial court has not addressed Hardin-Simmons's prayer for recovery of attorney's fees pursuant to the disposition, this matter is otherwise remanded to the trial court for further proceedings and entry of a new judgment in accordance with this opinion.


Patrick A. Pirtle
Justice